**UNITED STATES of America,**
**Appellee,**

v.

**Philip S. ZANGHI, II, Defendant,**
**Appellant.**

**No. 98–1047.**

United States Court of Appeals,
First Circuit.

Heard Feb. 3, 1999.
Decided Aug. 30, 1999.

---

Owen S. Walker, Federal Defender Office, for appellant.

Patty Merkamp Stemler, with whom Corey Smith, Andrew Levchuck, Assistant United States Attorney, Donald K. Stern, United States Attorney, and the Department of Justice were on brief for appellee.

Before SELYA, STAHL and LIPEZ, Circuit Judges.

LIPEZ, Circuit Judge.

Philip S. Zanghi, II, appeals from his conviction and sentence on twenty-three counts of securities fraud, tax evasion, engaging in monetary transactions involving the proceeds of unlawful activity, and violation of the money laundering statutes. The two money laundering counts alleged that he transferred proceeds of the securities fraud from corporate accounts to his own use with intent to evade taxes.[1] On

---

1. Counts 1–11 of the indictment charged Zanghi with securities fraud in relation to the sale of shares and options in the Indian Motocycle Company, Inc., in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b–5 (commonly known as Rule 10b–

appeal, Zanghi argues that there was insufficient evidence to convict him on the money laundering counts. The jury instructions on those counts went beyond the statute's requirements and stated incorrectly that the jurors could convict only if they found tax evasion to be Zanghi's sole intent in making the transfers. Zanghi claims that this instruction became the law of the case, and that our review should thus ask if the evidence was sufficient to meet the higher standard set by the erroneous instruction. This unusual contention is important to the outcome of this appeal because the evidence met the lower statutory standard but would not have met the higher standard proposed by the instruction. We conclude that the erroneous instruction should not become the law of the case, and reject Zanghi's sufficiency challenge.

Zanghi also protests the prosecutor's closing exhortation to the jury to "send a message" to him from his victims, and the court's admission of evidence of his other crimes and his flight from justice. Finally, Zanghi claims that the court erred in computing the sentencing range on certain counts by grouping those counts together under the guidelines. Since this sentencing issue requires us to resolve some apparent differences between other courts of appeals concerning how the applicable guidelines provision should be interpreted, we address the question in some detail. We affirm.

## I.

We briefly sketch the broad outlines of the facts of this case, adding detail below as it becomes necessary to the legal discussion. This case involves a business venture to revive the "Indian Motocycle," a brand of motorcycle manufactured in Springfield, Massachusetts from the early 1900s to the mid–1950s. In 1990, Zanghi obtained an interest in the Indian trademark, not then in use, from its owner Carmen DeLeone, with the stated intention of reviving the manufacture of Indian Motocycles. Zanghi then formed the Indian Motocycle Company, Inc. ("Indian"), and moved to Springfield where he established an office and operated the company.

Indian was not authorized by its articles of incorporation to issue preferred shares. Nonetheless, Zanghi sold preferred shares in Indian to numerous investors. Zanghi also sold options to purchase 80,000 shares of common stock in a related apparel and accessories company Zanghi founded, which was authorized to issue only 10,000 shares of common stock. He licenced the Indian trademark to various businessmen who wished to sell clothing, jewelry and other items bearing the Indian logo, and in several cases sold "exclusive" rights to use the mark in a region to more than one licencee. Zanghi transferred much of the funds raised through the fraudulent sale of securities and the licencing deals into his personal accounts. He also financed various personal expenditures, including the rental of two houses in Avon, Connecticut, using funds withdrawn directly from Indian accounts.

Although he realized substantial income from these transfers, Zanghi paid no personal income taxes in 1991 and 1992, and

5); Count 12 charged securities fraud in connection with the sale of options to purchase common stock in the Indian Motocycle Apparel and Accessories Co., Inc., also in violation of 15 U.S.C. §§ 78j(b) and 78ff(a) and 17 C.F.R. § 240.10b–5; Counts 13–15 charged Zanghi with tax evasion in connection with his under reporting of income on his 1990, 1991, and 1992 personal tax returns, in violation of 26 U.S.C. § 7201; Counts 16–17 charged Zanghi with making and subscribing to false corporate income tax returns for the Indian Motocycle Company, Inc., in violation of 26 U.S.C. § 7206(1); Counts 18–19 charged money laundering (specifically, withdrawing funds involving the proceeds of securities fraud with intent to engage in conduct constituting tax evasion under 26 U.S.C. § 7201) in violation of 18 U.S.C. § 1956(a)(1)(A)(ii); finally, Counts 20–23 charged engaging in monetary transactions with funds derived from securities fraud, in violation of 18 U.S.C. § 1957(a).

only minimal amounts in 1990. He also signed and filed false corporate income tax returns on behalf of Indian, significantly under reporting Indian's corporate income. (Zanghi was the sole shareholder of Indian, a subchapter S corporation, making Indian's income taxable to him.) Zanghi frequently recorded income to Indian and related corporations[2] (from, e.g., the licencing arrangements and advance royalties paid by various prospective Indian motorcycle distributors) as loans from himself to the corporations, thus (1) allowing the corporations to characterize the income as non-taxable proceeds of borrowing rather than taxable corporate income, and (2) allowing him to justify withdrawing the amounts from the corporate accounts for his personal use, while (3) characterizing these withdrawn amounts as loan repayments, which would not be taxable income to him.

Zanghi moved briefly to Raleigh, North Carolina in 1993 and then fled to Spain in January 1994 as the Indian venture began to unravel. He was ultimately arrested in New York City. A grand jury issued a 23 count indictment against him, charging him with securities fraud, tax evasion (under 26 U.S.C. § 7201), filing false corporate income tax returns, engaging in monetary transactions involving the proceeds of unlawful activity (specifically, the securities fraud), and violation of one of the money laundering statutes (18 U.S.C. § 1956(a)(1)(A)(ii)). After a jury trial,[3] Zanghi was convicted on all counts. This appeal followed.

## II.

### A. The Money Laundering Counts

Counts 18 and 19 of the indictment alleged that Zanghi twice withdrew $25,000 from Indian Motocycle Company accounts. The indictment alleged that these funds were the proceeds of securities fraud, and that Zanghi withdrew them knowing that the funds represented the proceeds of some form of illegal activity with "the intent to engage in conduct constituting tax evasion," a crime under the federal money-laundering prohibitions of 18 U.S.C. § 1956(a)(1)(A)(ii):

### § 1956. Laundering of monetary instruments

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; [is subject to fine, imprisonment up to twenty years, or both.]

Counts 18 and 19 asserted that Zanghi had "the intent to engage in conduct constituting tax evasion" in violation of section 7201 of the Internal Revenue Code ("Code"), the general provision of the Code directed at preventing tax evasion:

### § 7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution. 26 U.S.C. § 7201.

At trial the government produced evidence on Count 18 that Zanghi wrote a

---

2. In addition to the apparel and accessories company mentioned above (the "Indian Motocycle Apparel and Accessories Co., Inc."), Zanghi also organized the "Indian Motocycle Manufacturing Corp."

3. Zanghi represented himself at trial, although he had the benefit of court-appointed standby counsel throughout.

$25,000 check (No. 7943, written February 15, 1992) on an Indian account, making it payable to himself, and deposited this check into his personal account. Zanghi wrote "Repayment of Loan" on the check, making it appear that the check was a repayment of a personal loan from Zanghi to Indian. The government also produced evidence on Count 19 that Zanghi wrote a $25,000 check (No. 7955, February 28, 1992) on the same Indian account, making it payable to Paul Brazeau, an individual to whom Zanghi owed large personal debts predating the Indian venture. Zanghi wrote "Loan Repayment" on the check, making it appear that the check was in repayment of a loan by Brazeau to Indian.

The trial court instructed the jury that, in order to find a violation under § 1956(a)(1)(A)(ii), the jury was required to find that Zanghi had (1) engaged in a financial transaction, (2) which he knew involved the proceeds of securities fraud, and (3) that "defendant conducted a financial transaction charged in the Indictment with the intent of furthering income tax evasion." The court then elaborated on this last element as follows:

> The third and final element which the government must prove beyond a reasonable doubt in order to convict the defendant of money laundering is that the defendant conducted a financial transaction charged in the Indictment with the intent of furthering income tax evasion. The defendant acted intentionally, if he acted willfully, not by mistake or accident and with the deliberate purpose of promoting, facilitating or assisting in carrying on the income tax evasion.

> In order to convict the defendant [on] either or both counts of money laundering you must agree that the defendant conducted the financial transaction

charged in the Indictment with the purpose of evading taxes *and not for any lawful or other unlawful purpose.*

(Emphasis added.) Zanghi argues that the evidence was insufficient to sustain a conviction on the basis of this instruction. Specifically, he claims that the instruction mandated that the jury find that Zanghi's *sole* intent in conducting the transactions in question was to evade taxes,[4] and that although there might have been sufficient evidence to show that tax evasion motivated Zanghi, there was enough evidence that he had another motive (to disguise his theft of funds from Indian) to foreclose a jury from finding that tax evasion was his sole intent.

### B. Error in the jury instruction

The court's instruction to the jury on the simple tax evasion counts, Counts 13–15, alleging violations of 26 U.S.C. § 7201, included a straightforward intent instruction, telling the jurors that "[a]n attempt to evade income tax must be willful." Counts 18–19 alleged violations of 18 U.S.C. § 1956(a)(1)(A)(ii), which prohibits transactions involving the proceeds of criminal activity with intent to engage in conduct constituting a violation of section 7201, and thus incorporates the simple tax evasion offense's elements. However, on these counts, the court instructed the jury that it had to find that Zanghi conducted the transactions for the *sole* purpose of evading taxes. Since this sole intent instruction may indicate that the court concluded that § 1956(a)(1)(A)(ii) requires the government to prove a level of tax-evasion intent beyond that required by § 7201, we begin by analyzing the two statutes to dispel this notion.

■ Section 1956 makes it a crime for a person, knowing that "property involved in

---

4. We note that, arguably, the phrase in the jury instruction "and not for any lawful or other unlawful purpose" could sensibly mean "not *exclusively* for any lawful or other unlawful purpose." The government seems to propose this interpretation, *see* Appellee's Br. at 27, and we find it plausible. However, for the purpose of the "law of the case" discussion that follows, we assume that the jury would have interpreted this section of the instructions as Zanghi proposes.

a financial transaction represents the proceeds of some form of unlawful activity," to conduct or attempt to conduct such a financial transaction involving the proceeds of specified unlawful activity "with the *intent to engage in conduct constituting* a violation of section 7201 or 7206 of the Internal Revenue Code of 1986." 18 U.S.C. § 1956(a)(1)(A)(ii) (emphasis added). On its face, the statutory language indicates that an intent to engage in conduct that *in fact violates* Internal Revenue Code § 7201 is sufficient to satisfy the elements of § 1956; there is no separate requirement *in § 1956 itself* that the defendant have the "purpose of evading taxes ... and not ... any lawful or other unlawful purpose," as the court's instruction indicated.[5] Section 1956 does not require that a defendant know his conduct is a violation of the tax laws, except to the extent that § 7201 contains a scienter requirement, an issue to which we now turn.

■ Evidence that a taxpayer filed returns knowing that he should have reported more income than he did is sufficient to support a finding of willful intent to defeat and evade taxes under 26 U.S.C. § 7201. *See Sansone v. United States,* 380 U.S. 343, 351–53, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); *United States v. Fahey,* 510 F.2d 302, 306 (2d Cir.1974). "[I]n proving tax evasion, 'the government [does] not need to show direct evidence of tax motivation' so long as the jury has a sufficient circumstantial basis for inferring willfulness." *United States v. Olbres,* 61 F.3d. 967, 971 (1st Cir.1995) (§ 7201 case, citing *United States v. Hurley,* 957 F.2d 1, 4 (1st Cir. 1992) (§ 7206 case)); *see also McKenna v. United States,* 232 F.2d 431 (8th Cir.1956) (willfulness may be inferred from facts and circumstances attending the act, and one may be presumed to intend the necessary and natural consequences of his acts). "[T]he jury may ... infer willfulness from the fact of under reporting coupled with evidence of conduct by the defendant tending to mislead or conceal." *United States v. Sorrentino,* 726 F.2d 876, 880 (1st Cir. 1984) (citing *Holland v. United States,* 348 U.S. 121, 125, 75 S.Ct. 127, 99 L.Ed. 150 (1954)); *see also United States v. Larson,* 612 F.2d 1301, 1305 (8th Cir.1980) ("consistent pattern of understatement ... may be used to establish the essential inference of willfulness").

Sole or exclusive intent to evade taxes is not required under § 7201. "If the tax-evasion motive plays any part in [the affirmative willful] conduct the offense may be made out even though the conduct may also serve other purposes such as concealment of other crime." *Spies v. United States,* 317 U.S. 492, 499, 63 S.Ct. 364, 87

---

5. The legislative history of the provision supports this interpretation. Section 1956(a)(1)(A)(ii) was added by The Anti–Drug Abuse Act of 1988, Pub.L. 100–690, § 6471(a), 102 Stat. 4185, 4398 (Nov. 18, 1988). No Senate or House Report was submitted with the legislation. *See* 1988 U.S.C.C.A.N. 5937. However, Senator Biden's section-by-section analysis of the Act's provisions is in the Congressional Record. *See* 134 Cong. Rec. S17360–02, 1988 WL 182529 at *2 (Nov. 10, 1988). His analysis indicates that the language codified at § 1956(a)(1)(A)(ii) was derived from a version of § 1956 passed by the Senate in 1986 (part of S.2683, the Money Laundering Crimes Act of 1986). That version, according to Senator Biden, criminalized engaging in transactions with "intent to violate or promote a violation of section 7201 or 7206." (A version of the bill recorded at 132 Cong. Rec. S13403–01,

§ 562 (Sept. 23, 1986), similarly prohibits conducting a transaction "with intent to violate or facilitate a violation of section 7201 or 7206.") An amendment by the House of Representatives to the Senate-passed 1988 version replaced this language with "intent to engage in conduct constituting a violation of section 7201 or 7206." 134 Cong. Rec. S17360–02, 1988 WL 182529 at *51. According to Senator Biden, the amended "statute does not require that the person know that the conduct in which he engages is a violation of the tax laws. Intent to engage in conduct that in fact constitutes a violation of the specified statutes is sufficient." *Id.* at *52. Of course, nothing in the language of § 1956 eliminates any element of intent required independently by §§ 7201 or 7206.

We note that § 1956 is relatively new and has been infrequently applied. There is little precedent elucidating its application.

L.Ed. 418 (1943); *see also United States v. Eaken,* 17 F.3d 203, 207 (7th Cir.1994) (defendant also had motive of concealing embezzlement).[6]

## C. The significance of the erroneous jury instruction

██ The trial court's instructions on the money laundering counts were incorrect to the extent that they required the jury to find that Zanghi's sole intent in making the transactions was tax evasion. Zanghi argues that we should nonetheless measure the sufficiency of the evidence on these counts against the standard set by the erroneous instruction. We reject this argument.

██ On appeal, we measure the sufficiency of the evidence by asking whether the evidence, viewed in the light most favorable to the prosecution, would permit "a rational jury to find each essential element of the crime charged beyond a reasonable doubt." *United States v. Guerrero,* 114 F.3d 332, 339 (1st Cir.1997). Thus we measure the proof against the "essential element[s] of the crime charged." The terms of an indictment can raise the bar of proof for the government to a higher level than the bare minimum required by the terms of a criminal statute because the terms of the indictment specify the "crime

charged." [7] Here, the indictment did not charge that tax evasion was Zanghi's sole intent. Instead, it merely mirrored statutory language in charging that Zanghi conducted financial transactions with the proceeds of securities fraud "with the intent to engage in conduct constituting tax evasion, [in violation of § 7201, knowing] that the property involved ... represented the proceeds of some form of unlawful activity."

██ For the purpose of assessing a sufficiency challenge on appeal, an instruction may add elements to the government's burden of proof beyond those required by statute if that instruction has become the law of the case. "[W]hen a cause is submitted to the jury under an instruction, not patently incorrect or internally inconsistent, to which no timely objection has been lodged, the instruction becomes the law of the case." *United States v. Gomes,* 969 F.2d 1290, 1294 (1st Cir.1992). In such situations, we review for whether there was "evidence sufficient to support [the] convictions under the law of the case," *id.,* that is, evidence sufficient to establish the elements required by the actual instructions given. However, as *Gomes* makes clear, a "patently incorrect" jury instruction may not become the law of the case. *Id.*[8]; *see also United States v. Angiulo,* 897 F.2d 1169, 1196 (1st Cir.1990)

6. Consistent with these legal standards, the trial court correctly instructed the jury on the tax evasion counts (counts 13 to 15) alleging direct violations of § 7201. The instructions for these counts stated that the jury need only find that Zanghi "acted with intent to defraud" the United States of taxes—not that he acted with the *sole* intent to defraud.

7. *See, e.g., United States v. Taylor,* 933 F.2d 307, 310 (5th Cir.1991) (specific intent for crime of escape became element of offense, under law of the case, where defendant was indicted for willful escape and jury was instructed on specific intent); *United States v. Tapio,* 634 F.2d 1092, 1094 (8th Cir.1980) (per curiam) ("where willfulness is alleged in the indictment," court may instruct jury on specific intent, which element then becomes

law of case); *United States v. Woodring,* 464 F.2d 1248, 1251 (10th Cir.1972) (indictment charged wilfulness; thus specific intent instruction was held to establish law of the case).

8. At oral argument, counsel for Zanghi labeled the exceptions for "patently incorrect" or "internally inconsistent" instructions in the *Gomes* opinion as dicta. They are not. By concluding that the instruction given by the trial court *was* the law of the case, the *Gomes* court had to conclude that the "patently incorrect" and "internally inconsistent" exceptions did not apply to the case at hand. Therefore, the statement noting those exceptions is essential to the outcome of *Gomes* and is not dicta.

(instruction adding element held to be law of case where it "was not legally incorrect"). Therefore, the patently erroneous [9] sole intent instruction does not establish the standard by which we measure the sufficiency of the evidence on appeal.[10] Instead, we will evaluate the evidence produced against Zanghi to determine if it would allow a rational jury to find each essential element of the violation as charged under § 1956(a)(1)(A)(ii) beyond a reasonable doubt, disregarding the patently erroneous "sole intent" element.[11]

9. The government has argued that interpreting the instruction in question to require sole intent would be inconsistent with other instructions given by the trial court. Since we find that the "sole intent" instruction in question here was patently incorrect, and thus not the law of the case, we need not decide whether it was also "internally inconsistent" with the other instructions, or if such inconsistency (as against other, discrete parts of the instructions) would be sufficient, under *Gomes*, to allow us to conclude that the erroneous instruction should not become the law of the case.

10. In a letter Zanghi's counsel filed with the court to clarify his response to a question posed at oral argument, he cites several cases from other circuits in which he claims a "patently wrong" instruction became the law of the case. However, in every case cited, the indictment specified the elements that increased the government's burden of proof, thus making the instruction in question correct in light of the crime charged. *See Taylor, Tapio,* and *Woodring,* described *supra* note 7.

As additional support, Zanghi cites *United States v. Romero,* 136 F.3d 1268 (10th Cir. 1998). In that case the "indictment . . . expressly alleged that [the] victims were non-Indians" and the instructions placed the burden of proof for this element on the government. *Id.* at 1270. The court held that the "Government is required to prove all elements put forth in unchallenged instructions to the jury, even if the Government would not, under law, be otherwise required to do so." *Id.* at 1273. However, *Romero* is distinguishable because the instruction in that case was not "patently erroneous" in light of the statutory requirements. In fact, it may have been legally correct, as the burden may in fact have been on the government under law. The court declined to resolve the issue of its correctness since, as a colorably correct instruction not objected to, the burden established by the instruction became the law of the case.

## D. Sufficiency of the evidence

 Notwithstanding his argument concerning the erroneous jury instruction, Zanghi also argues that there was insufficient evidence to allow a rational jury to find that he had *any* intention to evade taxes in conducting the withdrawals in question. He claims that his *only* motive in conducting the withdrawals and labeling the checks as loan repayments was simple embezzlement, not tax evasion. We do not doubt that Zanghi's ruse conveniently al-

11. We are mindful that, even where an unobjected instruction adding elements to a crime is patently erroneous and therefore does not become the law of the case, such an instruction might so infect the charge as to leave the jury confused or poorly enlightened about what the essential elements of the crime are, thereby presenting an issue of plain error. *See* Fed.R.Crim.P. 52(b). However, defendant does not argue plain error on appeal, and ordinarily we would not discuss this issue even in passing, given our strong policy against addressing issues not presented to us. *See Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 352 (1st Cir.1989).

Nonetheless, to dispel any notion of unfairness in our disposition of the erroneous jury instruction issue, we note that any claim of plain error here would have been unavailing. On plain error review, reversal is warranted only where there is a "plain" or "obvious" error that affects substantial rights and has resulted in a "miscarriage of justice or has undermined the integrity of the judicial process." *Drohan v. Vaughn,* 176 F.3d 17, 21 (1st Cir.1999); *see also United States v. Olano,* 507 U.S. 725, 732–36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). These elements could not be met in this case. The erroneous instruction here was brief and stood at the end of the lengthy and otherwise correct instruction on the § 1956 counts. This brevity and placement made the erroneous instruction less likely to contaminate the correct instruction with any confusion resulting from their inconsistency. Moreover, the erroneous instruction was easily susceptible to an interpretation making it a correct statement of law: the jury could easily have understood the literally-erroneous phrase "and not for any lawful or other unlawful purpose" to mean "not *exclusively* for any lawful or other unlawful purpose." (*See supra* note 4.)

lowed him to conceal his securities fraud and embezzlement as well as his tax evasion. Characterizing the withdrawals as loan repayments allowed Zanghi to argue to Indian's accountant that those amounts were originally deposited in Indian's account as the proceeds of loans, not as the proceeds of the illegal sale of preferred shares in Indian (which they in fact were). It also allowed him to conceal the fact that he was converting these corporate funds to his personal use.

■ However, the evidence here was more than adequate to allow a rational jury to find beyond a reasonable doubt that Zanghi conducted the withdrawals with sufficient tax-evasive intent to meet the willfulness standard of § 7201. Zanghi paid no personal income taxes in 1991 and 1992 and minimal amounts in 1990. His under reporting of income in those three years totaled over one million dollars, and he reported none of the funds he withdrew from Indian accounts in 1990, 1991, and 1992 as personal income. When his personal accountant informed him of a large tax liability for 1992, he explicitly declared: "no taxes, no taxes. I can't pay any taxes." He labeled the two checks in question here as loan repayments (to himself, and to an individual to whom he was indebted). The government presented evidence that Zanghi routinely disguised money in this fashion, claiming that corporate funds had been advanced by him when they had in fact been raised through the illegal, unauthorized sale of securities. As we have explained above, the willfulness requirement of § 7201 may be satisfied by Zanghi's filing returns with knowledge that he should have reported more income than he did, see *Sansone*, 380 U.S. at 351–53, 85 S.Ct. 1004, and may be inferred from under reporting coupled with evidence of conduct tending to mislead or conceal, see *Sorrentino*, 726 F.2d at 880, or by consistent patterns of understatement, see *Holland*, 348 U.S. at 139, 75 S.Ct. 127.

Consistent patterns of understatement coupled with conduct tending to conceal are both present here. A reasonable jury could easily have found beyond a reasonable doubt that these facts, in combination, evinced Zanghi's "intent to engage in conduct constituting [willful tax evasion, i.e.] a violation of section 7201". 18 U.S.C. § 1956(a)(1)(A)(ii). The evidence thus suffices to support Zanghi's convictions under § 1956(a)(1)(A)(ii).

### III.

■ The prosecutor concluded his argument to the jury with the following statement:

> I ask you, ladies and gentlemen, send a message to the defendant, send a message from Ms. Eva Victor, Mr. Golash, Mr. Ferris, Mr. Psaras, Mr. Coates, that this type of thievery and deception is not to be tolerated. Send a message to Mr. Zanghi, guilty on every count.

(Victor, Golash, Ferris, Psaras and Coates were individuals defrauded by Zanghi.) Zanghi immediately objected, stating "that is not the jury's function in any way, shape or form, to send any messages to anyone, particularly the victims[12] in the case," and requested a mistrial. The court denied the request, stating that "[t]he jury will be instructed that arguments are not evidence." The court did so, and also instructed the jury that "it would be a violation of your sworn duty as judges of the facts to base the verdict upon anything but the evidence in the case." On appeal, Zanghi argues that the prosecutor's "message" argument asked the jury to consider an issue broader than Zanghi's actual guilt or innocence, and invited it to brush aside any doubts it might have about single counts by returning a verdict of "guilty on every count."

Assuming *arguendo* that this argument was inappropriate, we conclude that the

---

12. Of course, the prosecutor's argument asked the jurors to send a message *to* Zanghi *from* the victims. There was no request that the jurors send a message *to* the victims.

court did not abuse its discretion in refusing to declare a mistrial.

> In deciding whether a new trial [is] required—either because prosecutorial misconduct likely affected the trial's outcome or to deter such misconduct in the future—we consider the severity of the misconduct, whether it was deliberate or accidental, the context in which it occurred, the likely curative effect of the judge's admonitions and the strength of the evidence against defendant.

*United States v. Ingraldi* 793 F.2d 408, 416 (1st Cir.1986). Any prosecutorial misconduct here was not severe. The court reminded jurors that the arguments of counsel were not evidence. They were told to base their decision only on the evidence. The evidence against Zanghi on all counts was strong. We have already detailed the evidence supporting the money laundering counts. The government also produced financial records and testimony evidencing massive personal and corporate under reporting of income, supporting the personal and corporate tax violation convictions. The securities fraud convictions were supported by the testimony of numerous purchasers of "preferred shares" in Indian, the testimony of purchasers of options to buy shares in Indian Motocycle Apparel and Accessories Co., Inc., evidence of Zanghi's material misstatements regarding the Indian venture, and evidence of his scheme to convert corporate property to his personal use. Documentation of transfers of funds from Indian accounts to Zanghi's personal accounts supported the monetary transactions convictions. For all of these reasons, any error introduced by the prosecutor's comments was harmless.

## IV.

Zanghi protests the district court's admission of evidence of several instances of theft on his part, and of his flight to Spain. We address these issues in turn.

### A. Theft from Carmen DeLeone

██ Zanghi purchased a half interest in the Indian trademark from its owner, Carmen DeLeone, for one dollar in December 1989, promising that he (Zanghi) could arrange the necessary financing to begin manufacturing motorcycles under that trademark. During the negotiations leading up to this sale, DeLeone disclosed that he had an outstanding federal tax lien of $30,000. Zanghi stated that the lien would have to be "cleared up" before the two could do business, claimed to have a friend at the IRS who could remedy the matter, and somehow convinced DeLeone to give Zanghi $26,000 in cash on the pretense that Zanghi would forward it to his friend at the IRS. Zanghi kept the money instead.

At trial, Zanghi objected to the introduction of this evidence as irrelevant under Fed.R.Evid. 404(b), which states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, because Zanghi failed to report these payments on his federal tax return for 1990, this evidence was proof of unreported income, and was thus directly relevant to Count 13, alleging a knowing gross understatement of taxable income for that tax year in violation of 26 U.S.C. § 7201. In cases where a defendant is charged with under reporting income, there will often be instances where evidence of his acquisition of unreported income overlaps with evidence of other, uncharged bad acts. The district court did not err in allowing the admission of evidence of Zanghi's theft from DeLeone.

### B. Theft from the Avon houses

Zanghi rented two houses in Avon, Connecticut in 1991, one for himself and one for his children. Irene Shiu, owner of the house Zanghi rented for himself, testified that he moved some furniture she had stored in the basement of that house into his office at Indian during the period that

he rented the house. Although Zanghi eventually returned these items, he took with him numerous other items belonging to Shiu after he vacated the premises, including two televisions, an oriental rug, an oriental vase, and some liquor bottles. Although Zanghi objected to this testimony under Rule 404(b), the district court overruled the objection, finding that "relevance outweighs prejudice." Malcomb Robertson, owner of the house Zanghi rented for his children, found that the microwave oven and stove were missing after the children vacated the premises. Zanghi moved to strike the testimony but the court declined to do so.

■ The government argues that Zanghi's "borrowing" of furnishings from Shiu's basement to furnish the Indian office was part of his scheme to defraud investors by enhancing his credibility with prospective investors with improvements to the appearance of his office, and therefore was "closely entangled" with the Indian scheme. The government thus claims that this evidence was not evidence of "other crimes" introduced solely "to prove the character of" Zanghi, as forbidden by Rule 404(b). We find this theory of relevance plausible, and therefore conclude that the court did not abuse its discretion in admitting this evidence under Rule 404(b).[13]

The government also argues that the evidence of Zanghi's outright thefts from Shiu goes to his "intent ... to treat dishonestly all" those he dealt with during the period of his involvement with Indian. This theory of relevance is untenable, offering proof of bad acts to highlight Zanghi's general criminal proclivity, in direct contravention of Rule 404(b). The admission of this evidence was erroneous. The government concedes that the theft of items from the house rented for Zanghi's children was not admissible because there was no evidence linking these thefts to Zanghi rather than to his children. In light of the weight of the admissible evidence detailing Zanghi's theft from investors and other fraudulent activities, already noted, we conclude that both admissions were harmless error.

## C. Flight evidence

■ Zanghi moved to Raleigh, North Carolina in June 1993, renting a house for one year. He vacated the premises in January 1994, before the lease expired. The landlord testified at trial that Zanghi called him from Spain, explaining that "he had to leave unexpectedly and was not going to be able to honor the lease" because he had "problems" in the United States. According to the landlord's testimony, Zanghi also stated that the United States had "no extradition treaty with Spain" and that "it would be a safe haven for a period of time and that there were a lot of people from all over the world there that could not be extradited." At trial, Zanghi objected to this line of testimony; after a sidebar conference, the court ruled this evidence admissible. On appeal, Zanghi objects to the admission only on the ground that this evidence, offered as evidence of his flight, was more prejudicial than probative under Rule 403.

■ The court did not err in admitting this evidence. Evidence of an accused's flight may be admitted at trial as indicative of a guilty mind, so long as there is an adequate factual predicate for the inference that the defendant's movement was indicative of a guilty conscience, and not normal travel. *See United States v. Hernandez–Bermudez*, 857 F.2d 50, 52 (1st Cir.1988); *United States v. Grandmont*, 680 F.2d 867, 869 (1st Cir.1982); Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5181 (1999 Supp.). Here, in addition to the testimony of the landlord, there was testimony from another victim (Emanuel Psaras) supporting the inference that Zanghi

---

**13.** Zanghi does not argue that this particular admission was in error because the evidence was more prejudicial than probative under Fed.R.Evid. 403.

sought by his flight to avoid contact with his victims. Psaras testified that when he phoned Zanghi's number in Spain, the person answering the phone stated that Zanghi could not take the call, and Psaras only managed to speak to him by claiming that he was a relative of Zanghi's. Upon realizing the ruse, Zanghi answered, "You devil, you got me." These factual predicates made it sufficiently clear that Zanghi's departure to Spain was in fact flight indicative of a guilty conscience, and not normal travel. *See United States v. Bartelho*, 129 F.3d 663, 677–78 (1st Cir.1997) (facts showed relationship of flight plan to pending charges, making evidence of flight plan "relevant to prove [defendant's] consciousness of guilt" of those charges). Moreover, the evidence of flight as indicative of a guilty conscience was particularly relevant given that Zanghi denied that he had a guilty conscience, insisting that throughout he had worked hard for the benefit of all involved with Indian.

## V.

■ Zanghi was convicted of two counts (18 and 19) charging that he laundered a total of $50,000 in violation of 18 U.S.C. § 1956. He was also convicted on four counts (20 to 23) charging that he engaged in monetary transactions with the proceeds of securities fraud, in violation of 18 U.S.C. § 1957(a). The indictment charged that the total dollar amount involved in those four transactions was $324,999. In calculating Zanghi's sentence, the district court, adopting the recommendations of the probation department in the presentence report, divided Zanghi's offenses into three groups: one group for securities fraud offenses (counts 1 to 12), one group for corporate and personal tax offenses (13 to 17), and one group for the money laundering/monetary transaction offenses (18 to 23). In calculating the "total amount of harm or loss," U.S.S.G. § 3D1.2(d), involved in the grouped money laundering/monetary transaction offenses, the district court added the amounts indicated in the indictment, listed above, to the additional $238,000 of Indian Motocycle funds that Zanghi had converted to his own use in 1992 (but which had not been the subject of any charge in the indictment).[14] This addition led to a "total amount of harm or loss" of $612,999. On appeal, Zanghi claims "the district court erred in adding the monetary transaction amounts … to the § 1956 laundering amounts and applying to the total the much more punitive § 1956 guideline, § 2S1.1."

The district court's grouping of counts 18–23 was correct as a matter of law. The section of the Guidelines governing the grouping of multiple counts states that "[o]ffenses covered by the following guidelines are to be grouped together under this subsection: … §§ 2S1.1, 2S1.2, 2S1.3;…." U.S.S.G. § 3D1.2(d). Guideline § 2S1.1 corresponds to statutory pro-

---

**14.** Conduct not the subject of a criminal charge may nonetheless constitute "relevant conduct" for the purposes of the sentencing guidelines. *See* U.S.S.G. § 1B1.3(a)(2) (court shall determine specific offense characteristics on the basis of all acts part of same common scheme or plan with conduct grouped under § 3D1.2(d)). "[U]nder U.S.S.G. § 1B1.3, 'this court has repeatedly upheld the inclusion as relevant conduct of acts either not charged or charged but dropped,' and authorized resort to that conduct as a sentence-enhancing datum." *United States v. Rivera–Gomez*, 67 F.3d 993, 1001 (1st Cir.1995) (quoting *United States v. Garcia*, 954 F.2d 12, 15 (1st Cir.1992) (collecting cases)). *See also United States v. Sokolow*, 91 F.3d 396, 410–11 (3d Cir.1996) ($1.8 million derived from defendant's unlawful mail fraud scheme properly considered "relevant conduct" for purposes of specific offense characteristics under monetary transactions guideline § 2S1.2(b)(2), even though this amount was not charged in those counts); *United States v. Rose*, 20 F.3d 367, 372–73 (9th Cir. 1994) (same, for money laundering under § 2S1.1); *United States v. Johnson*, 971 F.2d 562, 576 n. 10 (10th Cir.1992) ("funds associated with uncharged instances of money laundering can be added in to determine the offense level under § 2S1.1 if those acts are within the scope of relevant conduct under § 1B1.3(a)(2).").

vision 18 U.S.C. § 1956 (money laundering), and § 2S1.2 corresponds to statutory provision 18 U.S.C. § 1957 (monetary transactions). It is plain that, by its literal terms, "[s]ection 3D1.2(d) requires grouping of the offenses of money laundering (U.S.S.G. § 2S1.2) and engaging in a monetary transaction in property derived from specified unlawful activity (U.S.S.G. § 2S1.1)." *United States v. Taylor,* 984 F.2d 298, 303 n. 2 (9th Cir.1993).

There are statements in the case law to the effect that "inclusion on [the] list [of offenses under § 3D1.2(d) ] does not mean that grouping is to be automatic." *United States v. Rudolph,* 137 F.3d 173, 185 n. 3 (3d Cir.1998) (Becker, C.J., concurring) (citing *United States v. Seligsohn,* 981 F.2d 1418, 1425 (3d Cir.1992) and *United States v. Harper,* 972 F.2d 321, 322 (11th Cir.1992)). We believe these statements question only whether it is imperative to group all offenses covered by guidelines listed in paragraph 2 of § 3D1.2(d),[15] and not those offenses covered by guidelines listed *in the same row* of that paragraph (each row is set off by a semicolon).[16] For instance, in *Harper,* 972 F.2d at 322, the court refused to group offenses under sections 2S1.1 and 2D1.1, stating that "grouping is not automatic" for offenses on the list in ¶ 2 of § 3D1.2(d). Both sections 2S1.1 and 2D1.1 were on the list, but in different rows. In *Seligsohn,* the offenses the court refused to group included mail fraud, tax evasion, and bribery, presumably guidelines sections 2F1.1, 2T1.1, and 2E5.1 respectively, all of which are on the list but in different rows.[17] *See also United States v. Williams,* 154 F.3d 655, 657 (6th Cir.1998) (guidelines in question were sections 2F1.1 and 2T1.1, both on the list but in different rows; court rejected the argument that "the district court had no choice but to group the counts"); *Taylor,* 984 F.2d at 303 & n. 2 (mandatory grouping of offenses under sections 2F1.1 and 2S1.2 rejected; however, grouping of § 2S1.1 and § 2S1.2 offenses required); *United States v. Johnson,* 971 F.2d 562, 576 (10th Cir.1992) (mandatory grouping of offenses under 2F1.1 and 2S1.1 rejected). Our holding today is consistent with these decisions. We conclude only that counts under guideline sections 2S1.1 and 2S1.2, which are listed in the same row of ¶ 2 of § 3D1.2(d), "are to be grouped" automatically.[18]

**15.** There is active debate on this point. *See, e.g., United States v. Napoli,* 179 F.3d 1, 1999 WL 366540 at *14–15 n. 4 (2d Cir.1999) (quoting *United States v. Emerson,* 128 F.3d 557, 564 n. 1 (7th Cir.1997) ("There is some question whether all of the offense sections listed under § 3D1.2(d) are to be grouped with each other, or if only those sections listed in the same row are to be grouped together.")).

**16.** In order to covey a sense of its format, part of ¶ 2 of § 3D1.2 is reproduced below:

Offenses covered by the following guidelines are to be grouped under this subsection:

§§ 2B1.1, 2B1.3, 2B4.1, 2B5.1, 2B5.3, 2B6.1;
§§ 2C1.1, 2C1.2, 2C1.7;
§§ 2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;
. . .
§§ 2S1.1, 2S1.2, 2S1.3;
. . . .

U.S.S.G. § 3D1.2. Each line between the section symbols (" §§ ") and the semicolon constitutes a "row."

**17.** The statutes of conviction are listed in *United States v. Seligsohn,* 1996 WL 383313 (E.D.Pa.1996). In *Seligsohn* the Third Circuit cited *Patterson,* a case whose reasoning we reject, *see infra* note 18.

**18.** Zanghi cites in his reply brief to *United States v. Patterson,* 962 F.2d 409, 417 (5th Cir.1992), as an example of a case where a court of appeals, engaging in de novo review of a grouping decision, reversed a grouping of counts involving the "offenses of receiving a stolen vehicle and alteration of a VIN" (Vehicle Identification Number). These offenses are covered by guidelines §§ 2B1.1 and 2B6.1, both of which are listed in the same row of paragraph 2 of subsection 3D1.2(d), and thus both counts "are to be grouped under" subsection 3D1.2(d). Nonetheless, the *Patterson* panel held that the district court's grouping of these offenses was error.

In *Patterson,* the Fifth Circuit panel relied on the holding of a previous panel of the same court in *United States v. Ballard,* 919 F.2d 255, 257 (5th Cir.1990). *Ballard* held, on de

██ Since the counts were "grouped together pursuant to § 3D1.2(d)," the court was required to apply the "offense guideline that produces the highest offense level," U.S.S.G. § 3D1.3(b), in this case the money laundering guideline § 2S1.1, and to aggregate the total value of the funds involved in determining the applicable offense level under that guideline, *see* U.S.S.G. § 3D1.3(b). The district court executed these calculations correctly in determining Zanghi's sentence.

*Affirmed.*

novo review, that the district court correctly refused to group the offenses of receiving a stolen Pontiac and altering the VIN of a Chevrolet, because the offenses involved "different cars, different owners, and two discrete events." *Id.* In reaching this conclusion, the *Ballard* panel relied on Guideline Background Commentary to § 3D1.2, stating "counts are grouped together only when they involve both the same victim . . . and the same or contemporaneous transactions [. . .]." *Id.* (quoting commentary; second ellipsis incorrectly omitted from quotation in original). However, the quoted passage continued "except as provided in § 3D1.2(c) or (d)." *See* U.S.S.G.App. C, Amendment 256. Moreover, all of the language quoted above was deleted from the commentary by Amendment 256, effective November 1, 1989, prior to the date of Bal-

lard's guilty plea (January 25, 1990; *see Ballard,* 919 F.2d at 256). (The quoted language was replaced with the phrase "Counts involving different victims (or societal harms in the case of 'victimless' crimes) are grouped together only as provided in subsection (c) or (d)." The purpose of this amendment was listed as "clarify[ing] the commentary." *See* U.S.S.G.App. C, Amendment 256. The amended language is part of the current commentary applicable to Zanghi's case. *See* U.S.S.G. § 3D1.2, comment. (backg'd.).)

Neither *Ballard* nor *Patterson* is binding on us, and we find neither persuasive because of *Ballard's* reliance on obsolete commentary. (We note that the *Patterson* panel appears to have been aware of the fact that *Ballard* may have been wrongly decided. *See Patterson,* 962 F.2d at 417 n. 5.)