COMMONWEALTH *vs.* NATHAN H. DAVID.

Suffolk.    January 8, 1974. — April 2, 1974.

Present: TAURO, C.J., REARDON, HENNESSEY, & KAPLAN, JJ.

*Pleading, Criminal,* Indictment.  *Evidence,* Burden of going forward. *Sale of Securities Act.   Sale,* Of securities. *Law of the Case. Words,* "Sale," "Isolated sale," "Broker," "Salesman."

At the trial of an indictment charging the sale of securities by one who was not a registered broker in violation of G. L. c. 110A, § 9, evidence of the circumstances in which the defendant actively and aggressively pursued a course of conduct resulting in the sale of certain securities which he did not own to five different individuals warranted a finding that he sold the securities.  [49-53]

The Sale of Securities Act, G. L. c. 110A, does not establish as an element of the crime of sale of securities by one who is not a registered broker proof that the transaction was not exempt under c. 110A, § 3.  [53-54]

At the trial of an indictment charging sale of securities by one who was not a registered broker in violation of G. L. c. 110A, § 9, the defendant had the burden of going forward with evidence that the transactions

were exempt under § 3, and where no such evidence appeared the
Commonwealth was not required to prove absence of exemption
beyond a reasonable doubt; and a ruling to the contrary by the trial
judge, made at the close of all the evidence, did not establish "the law
of the case." [54-56]

At the trial of an indictment charging sale of securities by one who was
not a registered broker in violation of G. L. c. 110A, § 9, testimony
that two buyers of the securities were "stockbrokers," without any
evidence that either was registered as such, did not create a viable
issue of their registration as stockbrokers so as to place on the
Commonwealth the burden of proving that the transactions were not
exempt under c. 110A, § 3 (h), as sales to registered brokers. [56]

At the trial of an indictment charging violations of the Sale of Securities
Act, G. L. c. 110A, where the defendant was not the owner of the
securities sold, whether the sales were exempt as isolated sales under
c. 110A, § 3 (a), was correctly determined with reference to the
defendant's conduct, rather than that of the owners of the secu-
rities. [57-58]

Certain sales of stock of the same company to five different persons over
a period of several months by one not the owner of the stock were not
exempt under G. L. c 110A, § 3 (a), as isolated sales. [58]

INDICTMENT found and returned in the Superior Court on
November 10, 1971.

The case was heard by *Hale*, J.

*Lawrence D. Shubow* for the defendant.

*Howard J. Camuso*, Assistant Attorney General, for the
Commonwealth.

HENNESSEY, J.   The defendant, who is and was at all
material times an attorney, by this bill of exceptions
challenges his convictions, after a trial without jury in the
Superior Court, on all five counts of an indictment for
violations of the Sale of Securities Act, G. L. c. 110A.[1] A fine
of $200 was imposed on each count. The five counts,
identical but for dates, amounts, and buyers, charged that
the defendant "on or about ... [a specified date], at Boston,
within the County of Suffolk, did knowingly sell a certain
security, to wit: . . . [a number of] shares of the common

---

[1] Statute 1972, c. 694, struck out in its entirety the version of G. L. c. 110A under
which the defendant was convicted and inserted the Uniform Securities Act in its
place.

stock of Synergistics, Inc., to . . . [a named buyer], said sale not being then and there exempted by section three of chapter one hundred and ten 'A' of the General Laws of said Commonwealth; and said Nathan H. David not being then and there registered either as a broker or as a salesman by the commission supervising and controlling the Department of Public Utilities."

The particular section of G. L. c. 110A which establishes as a violation of law the sale of securities by one who is not a registered broker is § 9. That section, in relevant part, reads as follows: "No person shall sell any security within this commonwealth, whether or not such security is exempt under section four, except as provided in section three and section fifteen (*a*), unless he is registered as a broker or salesman by the commission." Punishment for such a violation is provided in § 19 of that chapter. Section 3 of that chapter lists various kinds of sales of securities to which the chapter does not apply, and the defendant, as shown below, relies on three of these "exemptions" in particular.

The defendant's argument in this court is that there was not sufficient evidence to warrant conviction on any count. There is no question that he was not registered either as a salesman or a broker under G. L. c. 110A. More specifically, the defendant argues (1) that he was not involved in any sale within the meaning of the statute, and (2) that the burden of proof was on the Commonwealth to prove that the transactions were not exempt under the statute, and the Commonwealth failed to sustain its burden. Thus the defendant says that the Commonwealth did not prove that the transactions were not exempt under published regulations (G. L. C. 110A, § 3 [k]), did not prove that the transactions were not exempt as sales to registered brokers (G. L. c. 110A, § 3 [h]), and did not prove that these transactions were not isolated sales (G. L. c. 110A, § 3 [a]).

We affirm the convictions as to all five counts of the indictment.

1. We turn first to the defendant's contention that he

was not involved in any sales within the meaning of G. L. c. 110A. As to each of the five counts there was evidence to warrant the judge in finding, as he did, that the defendant "sold" the stock in violation of the law, as alleged. "Sale" is defined in G. L. c. 110A, § 2 (d), to include any "solicitation, looking to a sale, or offer or attempt to sell in any form, whether spoken or written." The defendant's involvement in the prohibited transactions, while he was not the owner of any of the stock sold, was hardly that of an innocent participant. Either directly or indirectly he was the initiator of all the transactions, and he served as the intermediary through whose active and aggressive course of conduct, continued over a period of several months, the illegal sales were consummated.

Count 1 of the indictment charges a sale by the defendant to one David Freedman of 6,000 shares of the stock of Synergistics, Inc. The defendant and David Freedman had been acquainted for about thirty-five years. In February, 1968, the defendant called Freedman, whom he had not seen for many years, to invite him to lunch, at which meeting the defendant told Freedman about a stock named Synergistics, Inc. As a result of this conversation, Freedman bought 200 shares of Synergistics on the open market in March, 1968, which he sold at a profit in August, 1968.

In late August, 1968, the defendant called Freedman and invited him to his office, saying he had something interesting to tell him about Synergistics. At this meeting the defendant went into great detail explaining the stock. He said the company had $4,000,000 in assets, had developed a new machine which would revolutionize the credit card business, and was going into the cable television business. The defendant told Freedman that "the company was going like bandits." No stock was purchased as a result of that meeting.

About a week later, in early September, 1968, the defendant again invited Freedman to his office and told him: "I might get—make up a good deal here on the Synergistics stock." He told Freedman the purchase price

would be about $100,000. The defendant suggested that Freedman aggregate this amount from a group of investors; he knew that Freedman was a member of an investment group. The defendant would try to get him a lower price than that previously quoted. At a later meeting the defendant told Freedman that he had been able to get the price lowered by $1 a share.

In early October of 1968 the defendant called Freedman to check on the progress of the transaction. Freedman told him some money had been gathered and, in response to the defendant's request that the checks be personally delivered rather than mailed, brought them into the defendant's office. These checks, totaling $93,000, had been made out to "Nathan H. David, Trustee," at the defendant's request. Freedman received a certificate for 6,000 shares from the defendant. The defendant told Freedman he was receiving $1 a share from the sellers. Freedman signed an investment letter addressed to Synergistics and a second letter addressed to the four owners of the shares he was purchasing as each letter was presented to him by the defendant David in the defendant's office. One of those owners testified that he assembled "as a favor to Mr. David, the 6,000 shares that his [David's] clients desired to purchase."

Count 2 alleges that the defendant sold 200 shares of Synergistics stock to one Hyman Freedman. At the defendant's request, David Freedman talked to his brother Hyman about purchasing Synergistics stock. Hyman was not interested in making a purchase at that time, and David relayed this information to the defendant. Hyman was not a party to the purchase of the $93,000 block of stock.

However, Hyman later gave his brother David Freedman a check for $3,100 for 200 shares of Synergistics stock, made out to Nathan David, and David Freedman delivered it to the defendant. Hyman told his brother David that the defendant had called him regarding the purchase of stock, and that he (Hyman) had bought some. According to Hyman, he had discussed the stock with the defendant, who had told him: "The company is doing well. It's a good

company, and they have some possibility in CATV."

Count 3 alleges that the defendant sold 1,000 shares of Synergistics stock to one Marshall Sterman.[2] Sterman testified that the defendant did not solicit him to buy Synergistics stock, although Sterman talked with the defendant prior to the purchase. Sterman was not sure who brought up Synergistics in the conversation. The defendant thought there were some shares available from an insider and that if Sterman wanted them he could probably buy them at a price of $16 a share. The defendant received an amount for his services equal to $1.50 a share.

Count 4 alleges that the defendant sold 1,500 shares of Synergistics stock to one Joseph Spagnuolo. Sterman told the defendant that Spagnuolo might be interested in purchasing some Synergistics stock. The defendant told Sterman that he would see if there was some available. In November, 1968, Spagnuolo, who was then in the restaurant business, purchased 1,500 shares at $16 a share. Spagnuolo testified that he was solicited to buy shares by Sterman rather than by the defendant, but did testify that he bought the stock from the defendant David.

Count 5 alleges that the defendant sold 1,000 shares of Synergistics stock to one Jeffrey Power. Sterman testified that Power was a close friend of his, and he (Sterman) talked to the defendant about buying stock for Power. Power was a stockbroker. He had never met the defendant; Sterman told him about the stock.

Power bought 1,000 shares at $16 a share. Power made out the check for $16,000, leaving the payee's name blank. When the paid and cancelled check was returned, the payee named was "Nathan David, Trustee."

In sum, the defendant played a key role in each of the transactions, whether he offered the stock to the purchaser personally or operated through an intermediary. The judge

[2] The record indicates that Sterman bought the 1,000 shares for S & G Associates. The certificate for the stock was made out to S & G Associates. Receipt of the certificate was acknowledged by Sterman. The record reveals no other information about S & G Associates.

was warranted in rejecting the conclusions of those buyers who testified that the defendant did not "solicit" them in light of their further testimony as to the details of their dealings with him. For example, there were inherent contradictions in the testimony of Spagnuolo, who, while denying that he was solicited by the defendant, testified that he "bought the stock from the defendant David." There was no error in the judge's finding that in each case the defendant sold the stock within the meaning of c. 110A, § 2 (d).

2. We now turn to the defendant's argument that the Commonwealth had the burden of proving beyond a reasonable doubt that the sales were not exempt under certain provisions of G. L. c. 110A, that the Commonwealth failed in that burden, and that therefore the judge was not warranted in reaching findings of guilty. In support of his argument, the defendant correctly states, inter alia, that the Commonwealth asserted in general language in the indictments that the sales were not exempt and, further, that the trial judge ruled that the burden rested on the Commonwealth to disprove the exemptions. The defendant relies on three specific exemptions as shown in G. L. c. 110A, § 3, viz.: sales exempted under regulations of the commission (§ 3 [k]); sales exempted because made to a registered broker (§ 3 [h]); and sales exempted because they were "isolated sales" (§ 3 [a]).

At the close of his case, the defendant requested various rulings from the trial judge. As to each count, the following request was allowed: "11. The Commonwealth must prove beyond a reasonable doubt that the transaction was not exempt under G. L. c. 110A, § 3." As to each count, the following request was denied and an exception noted: "12. The Commonwealth has failed to prove beyond a reasonable doubt that the transaction was not exempt under G. L. c. 110A, § 3."

We hold, on reasoning which appears below, that G. L. c. 110A does not establish, as an element of the crime, proof that the transaction was not exempt. We further hold that

it is only where evidence appears that an exemption applies, that proof of the contrary beyond a reasonable doubt becomes necessary to a conviction. Exemption is thus an affirmative defence. Like other such defences it requires the defendant to satisfy the burden of production of evidence before the Commonwealth must meet its burden of persuasion. LaFave and Scott, Criminal Law, 44-51 (1972). McCormick, Evidence (2d ed.) § 346, p. 830 (1972). Cf. *Commonwealth* v. *Eddy*, 7 Gray 538 (1856), *Davis* v. *United States*, 160 U. S. 469, 484 (1895), *Commonwealth* v. *Costa*, 360 Mass. 177, 185-186 (1971) (evidence and burden of proof of insanity), and *Commonwealth* v. *Valleca*, 358 Mass. 242 (1970) (defendant has burden of going forward with evidence that he was exempted from prosecution as an accessory after the fact by consanguinity with the principal offenders).

We consider first the defendant's argument which arises from the fact that no regulations of the commission were entered in evidence. The contention is that the Commonwealth's case falls as to all counts because of its failure to prove that the transactions in question were not exempt under § 3 (k) of c. 110A, which provides that regulations of the commission may exempt sales or types of sales other than those already exempted by subsections (a) through (j).

This argument, that the Commonwealth failed to prove an element of the crime, is incorrect. General Laws c. 277, § 37, which governs the necessity in an indictment of negativing a statutory exemption of what would otherwise be criminal conduct, reads as follows: "An excuse, exception or proviso not stated in the enacting clause of a statute creating a crime or stated only by reference to other provisions of the statute need not be negatived in the indictment unless necessary for a complete definition of the crime. If any statute shall prescribe a form of indictment in which an excuse, exception or proviso is not negatived, it shall be taken that it is not necessary to a complete definition of the crime that they should be negatived. If a

statute creating a crime permits an act, therein declared to be criminal, to be performed without criminality under stated conditions, such conditions need not be negatived."

Although it can be argued that the first and third sentences of § 37 are mutually inconsistent and therefore ambiguous,[3] neither helps the defendant here. The third sentence can in no sense be considered favorable to the defendant. Even should the first sentence be deemed applicable, we do not believe it aids the defendant. General Laws c. 110A, § 19, makes the violation of any provision of c. 110A criminally punishable. Section 9 of that chapter requires that "[n]o person shall sell any security within this commonwealth, . . . except as provided in section three . . ., unless he is registered as a broker or salesman by the commission." Either or both of these sections might be deemed the "enacting clause." As the exemption itself appears in § 3 and is stated in the enacting clause only by reference, it need be negatived in the indictment only if necessary to a complete definition of the crime. We believe it is not necessary; the language quoted from § 9 completely and adequately defines the crime. Accordingly, the language in each count negativing the exemptions in § 3 of the statute was surplusage. Cf. *Commonwealth* v. *Renfrew*, 332 Mass. 492, 493-494 (1955); *Couture* v. *Commonwealth*, 338 Mass. 31, 32, fn. 1 (1958). Since the crime charged here was entirely created by statute, the essential elements to be proved are identical with the essential allegations of the indictment. Although the regulations were not introduced in evidence, no element of the crime was left unproved.

The defendant nevertheless argues that, even if the judge erroneously placed the heavy burden on the Commonwealth of proving beyond a reasonable doubt that the exemptions were inapplicable, his ruling established "the law of the case." We disagree. Had the ruling come at a different time, we might give credence to the possibility

---

[3] Compare *Commonwealth* v. *Lee*, 247 Mass. 107 (1923), *Commonwealth* v. *Sokorelis*, 254 Mass. 454 (1926), and *Commonwealth* v. *McKnight*, 283 Mass. 35 (1933), with *Commonwealth* v. *Renfrew*, 332 Mass. 492 (1955).

that the defence had withheld evidence of possibly exculpatory regulations in reliance on the Commonwealth's failure to produce any evidence at all to the contrary. But the judge made his ruling not at the close of the Commonwealth's case but at the close of all the evidence. We are unwilling to assume that the defendant withheld favorable evidence merely in the hope of getting such a ruling as would make its production unnecessary, particularly where we have ruled that he was not entitled to the ruling. Should such favorable evidence as would prove an exemption exist in the regulations, after all, it is still open to the defendant to move for a new trial. G. L. c. 278, § 29.

3. The defendant also contends that the Commonwealth had the burden, and failed in that burden, of proving that two of the charges (counts 3 and 5) were not exempt under § 3 (h). That provision makes the chapter inapplicable to "[a]ny sale of securities to a registered broker." As with the other exemptions argued, the Commonwealth had no burden to disprove the applicability of subsection (h) until such time as the matter was put in issue, either by the defence or by one of its own witnesses. We conclude that it never was. While the record shows testimony that each buyer in counts 3 and 5 was a "stockbroker," no evidence appears that either was registered as such. In one case, the opposite is apparently true. We know that Sterman was an officer of a registered brokerage firm and was registered as a "salesman." Since the statute defines "broker" and "salesman" to be mutually exclusive, he presumably could not have been a registered broker. G. L. c. 110A, § 2 (e), (f). In any case, there was no evidence to create a viable issue of either buyer's registration as a broker so as to place the burden on the Commonwealth of proving the exemption inapplicable.

4. Finally, since the defendant here attempted to prove, and requested rulings to the effect, that his transactions were exempt as isolated sales under c. 110A, § 3 (a), we accept as correct his contention that the Commonwealth had the burden of producing sufficient evidence to prove

otherwise beyond a reasonable doubt. We conclude that the Commonwealth sustained its burden. On their face, the sales in question could hardly be called isolated under the statute. There were five separate transactions in stock of the same company which occurred over a period of several months and which appeared to fit a pattern that could readily be described as "repeated and successive."

The defendant argues, however, that the determination of what is an isolated sale depends on who was the owner of the stock sold and that, as various different owners were involved in these sales, each sale not otherwise exempt[4] should properly be regarded as isolated. He relies for this proposition on an earlier version of § 3 (a) (St. 1921, c. 499, § 1) which exempted: "Any isolated sale of any security by the owner thereof, or his representative, for the owner's account, such sale not being made in the course of repeated and successive transactions of a like character by such owner or on his account by such representative." *Kneeland* v. *Emerton*, 280 Mass. 371, 381 (1932). There may well have been authority for equating the two versions of the statute on which the defendant conceivably could have relied. This is reflected in the history of the statute which indicates that the change in the language was not intended as a substantive amendment. See 1931 House Doc. No. 1299, p. 2. Cf. *Commonwealth* v. *Kozlowsky*, 238 Mass. 379, 387 (1921). Thus we consider his argument in light of the earlier provision.

Applying the earlier version, the defendant's argument must nevertheless fail. It was early established that this "exception in § 3 (a) is designed for the benefit of" owners desiring to sell holdings in one lot, without splitting them among successive transactions, and that it cannot be invoked by one acting in the capacity of a broker rather

---

[4] The defendant correctly urges that, in considering whether any specific sale was isolated, other transactions otherwise exempt are not to be taken into account. *Kneeland* v. *Emerton*, 280 Mass. 371, 389 (1932). However, as we have decided that none of the transactions in question is otherwise exempt, this principle need not concern us. See discussion of exemption under § 3 (k) and § 3 (h), *supra*.

than an owner. *Kneeland* v. *Emerton*, 280 Mass. 371, 381 (1932). While the earlier statute appears to make the owner the reference point to measure the isolation of the transaction, the *Kneeland* case makes clear that it does so in the context of considering violations by an owner. Where the conduct in question is that of someone other than an owner, it clearly makes sense to determine whether the sales are isolated, if at all, with reference to his own conduct. Otherwise the exception would allow anyone to carry on an extensive brokerage business without registration, so long as he did not twice within a reasonable period handle sales for the same owner.

Such an interpretation is manifestly at odds with the regulatory purpose of the statute, and we reject it. The defendant's five separate but parallel sales were clearly "made in the course of repeated and successive transactions of a like character." The evidence was clearly sufficient to warrant finding beyond a reasonable doubt that they were not exempt.

5. Since our consideration of this appeal has entailed an examination of the complexities of various statutory provisions, we consider it advisable to add that even a rudimentary knowledge of G. L. c. 110A would have placed the defendant, an attorney, on notice that he was acting in violation of the law. Our meticulous attention in this opinion to statutory terms and definitions is necessitated by the detailed arguments of the defendant. He was, of course, entirely within his rights in offering such defences, particularly because there is no evidence that he indulged in fraud or deceit in any of these transactions.

*Exceptions overruled.*