KAFKER, J.
**755 *79 Angry about being asked to move out of the victim's home, the defendant broke into a locked gun safe, stole one of the weapons, shot and killed the victim, and aimed the gun at first responders. A jury convicted the defendant of murder in the first degree with deliberate premeditation; assault by means of a dangerous weapon under G. L. c. 265, § 15B (b ) ; armed assault with intent to murder under G. L. c. 265, § 18 (b ) ; one count of larceny of a firearm under G. L. c. 266, § 30 ; and four counts of possession of a firearm without a firearm identification card under G. L. c. 269, § 10 (h ) (1). He was sentenced to life in prison without the possibility of parole for the murder conviction, with terms of imprisonment for the other convictions to run concurrently with the life sentence.
This appeal focuses on the operability of firearms and the effect of an inoperable gun on the charges of armed assault with intent to murder and assault by means of a dangerous weapon. More particularly, the defendant contends (1) the evidence was insufficient to sustain his murder conviction because it did not connect the ".22 caliber class projectile" that killed the victim with a .223 caliber cartridge casing shown to have been fired from the .32-40 caliber Winchester rifle recovered from his person; and these deficiencies and other evidence supported the existence of a third-party culprit (the victim's husband's brother); (2) a required finding of not guilty should have been entered as to the charges of armed assault with intent to murder and assault with a dangerous weapon because when the defendant aimed the Winchester rifle at the first responders it was not operable; (3) a new trial should be granted because the judge gave conflicting and confusing operability instructions with respect to armed assault by means of intent to murder and assault with a dangerous weapon; and (4) we should grant a new trial pursuant to G. L. c. 278, § 33E.
For the reasons stated infra, we conclude that there was no reversible error. The evidence was sufficient to prove that the defendant shot and killed the victim with a ".22 caliber class projectile" fired from a .32-.40 caliber Winchester rifle. We also clarify that a firearm or other gun need not be operational to prove either assault by means of a dangerous weapon or armed assault with intent to murder. It is enough for assault by means of a dangerous weapon that the weapon appear dangerous to the victim of the assault; the **756 weapon does not actually have to be operational. Armed assault with intent to murder requires that the defendant think his or her weapon is operational -- otherwise the defendant lacks the specific intent to murder -- but not that the weapon actually be operational. Although the instructions were not correct in this regard in the instant case, the defendant here was the beneficiary of the error, as the judge needlessly required the firearm to be operational for armed assault with intent to murder. The jury so found, and the evidence supported such a finding, because the gun fired when it killed the victim and a jury could infer that it was operational after that. Finally, after a thorough review of the record, we also find no reason to exercise our authority under *80 G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the verdict of murder in the first degree. We therefore affirm the defendant's convictions.
1. Facts. We recite the facts that the jury could have found, viewing them in the light most favorable to the Commonwealth, and reserving some details for later discussion. Commonwealth v. Latimore, 378 Mass. 671, 676-677, 393 N.E.2d 370 (1979). The victim and her husband lived in a home in a rural part of Middleborough. In 2011, the husband's brother moved into the home. Between them, the husband and the brother owned approximately ten guns for hunting, mostly rifles, which were kept in closets in their bedrooms or locked in a metal gun safe in the basement.
The defendant was an acquaintance and occasional coworker of the brother. In mid-June 2013, the defendant began temporarily staying at the victim's home to be close to a repair job he and the brother had at a hotel. Near the end of June, the victim invited the defendant to remain at the home. The defendant continued living at the home to work with the brother on another job. The brother and the defendant also worked on a house the victim owned to prepare it for sale.
On the morning of Thursday, July 11, 2013, the brother found a note that the victim had left for him requesting that he and the defendant move out.[1] Later that day, when the brother told the defendant about the note, the defendant grew angry and upset. He asked, "What's wrong with that bitch?" and expressed unhappiness that he had to continue performing repairs on the victim's **757 home that weekend. The defendant remained upset through the afternoon about having to work on the victim's house that weekend despite being asked to move out. At dinner with the husband and brother, he still "wasn't pleased" that he had to leave, even though the brother told him that he had begun looking for apartments for them to move into together.
At 9:30 P . M ., the brother went to bed in his bedroom on the second floor, while the defendant and the husband watched television in the living room on the first floor. The brother was asleep by 10 P . M . At some point the husband also went to bed.
Deoxyribonucleic acid (DNA), fingerprint, footprint, blood, and hair evidence showed that, sometime that evening, the defendant went into the basement of the house. He used a shovel to force open the gun safe and remove several rifles, injuring himself in the process. He left his DNA on the shovel and his fingerprint, a footprint, blood, and hair on the gun safe (and blood and hair on the surrounding floor). He then used a pair of pliers to cut the gun lock off a .32-.40 caliber Winchester rifle (the Winchester rifle) that belonged to the husband, and loaded it with ammunition, leaving his DNA on the pliers, a box of ammunition, and two .22 caliber rifles.
The victim had been having dinner with her daughter that evening and returned home after 11 P . M . A neighbor heard a single gunshot coming from the direction of the home at approximately 11:45 P . M .
After shooting the victim, the defendant returned to the basement and struck the rifle against the floor to remove the spent .223 caliber Remington cartridge casing. In the process, he broke the rifle's wooden *81 stock. Fragments of wood from the Winchester rifle were subsequently discovered on the basement floor. The defendant then left the basement through the bulkhead, which investigating officers later found open, and went into the woods.
At around midnight on July 12, the husband woke up the brother,[2] who came out of his room to see the victim on the landing of the staircase covered in blood, not conscious, and bleeding from her nose and mouth. The brothers could not tell what was causing the victim's bleeding. The husband telephoned 911 to report a medical emergency and then attempted to apply cardiopulmonary resuscitation. The brother also tried to tend to **758 the victim.
The brother subsequently went downstairs, where he noticed more blood on the stairs and in the living room and the kitchen. In the kitchen, he washed the victim's blood off his hands and obtained a flashlight that he took to the end of the dark driveway to help direct emergency personnel. Firefighters arrived at the home within minutes to attend to the victim, followed shortly by an ambulance service and two police officers.[3]
A police officer and a paramedic, as well as the brother, were outside the home when the defendant emerged from the woods carrying the Winchester rifle. The paramedic saw the defendant pull the lever action of the weapon down and back, suggesting that the rifle was being readied for firing.[4] The paramedic immediately began running toward the house; to alert the police officer, he shouted words to the effect of, "Does that guy have a fucking gun?" While running, he turned around and saw the defendant raise the gun to firing position and aim it at him and the police officer.
Alerted by the paramedic, the police officer saw the defendant aiming the rifle at him from approximately thirty yards away. The officer attempted to move out of the way, but the defendant "tracked" him with his rifle, causing the officer to fear for his life. The officer shouted to the defendant to "drop [his] gun" and then fired his service weapon at the defendant.[5] The defendant fell to the ground but attempted to raise his rifle again, causing the officer to fire further shots until the defendant was no longer moving and the gun was completely on the ground. The officer fired a total of ten shots at the defendant, striking him three times.
A second police officer disarmed the defendant by kicking the rifle away and then throwing it out of the defendant's reach. The lever of the defendant's rifle was open, a live round of .223 caliber ammunition was on the ground nearby, and the defendant **759 had three additional live rounds of .223 caliber ammunition in his pockets. However, the stock of the defendant's rifle was broken, and a police ballistics expert *82 later determined that the rifle could not fire without certain repairs.[6] As discussed supra, there was evidence that the defendant struck his rifle against the floor of the basement before confronting the first responders.
After the defendant had been subdued, two firemen began treating the defendant for his gunshot wounds. The defendant was visibly angry and said, "Next time I'll come back with a bigger gun." The defendant was handcuffed and transported to a hospital, where, in addition to receiving medical treatment, his clothes were seized by the State police. The brother and the victim's husband were also handcuffed and placed in separate police cars. They were later interrogated at the police station before being released early in the morning.
The medical examiner who performed the autopsy subsequently estimated that the victim had died within minutes due to a bullet that pierced her lung, penetrated her pulmonary artery and vein, and lodged itself in her spine. Based on gunpowder residue around the wound, the medical examiner estimated that the victim was shot from no more than two feet away.
At trial, a police ballistics expert employed various forensic ballistics techniques to try to determine whether the bullet recovered from the victim and the cartridge casing in the basement were fired by the Winchester rifle recovered from the defendant's person. The expert testified that the bullet recovered from the victim's body was a ".22 caliber class projectile" that was in "very good condition" but only had "rifling" in trace amounts on its base, and no rifling on its sides.[7] The expert concluded that the bullet had been fired from a larger barreled gun than the kind for which it was designed, although, due to the lack of rifling, he was "inconclusive" about whether the bullet came from the Winchester rifle.
**760 However, based on a comparison between the unique firing pin marks on the cartridge[8] and those of bullets test-fired from the rifle,[9] the ballistics expert was able to conclude to a "reasonable degree of ballistics certainty" that the .223 caliber cartridge casing found in the basement "was fired by the .32-.40 Winchester lever action rifle." The expert also testified that the physical condition of the cartridge "was consistent with being fired out of a *83 larger caliber weapon than a .223 Remington," such as the Winchester rifle.[10]
From the testimony and physical evidence presented at trial, the Commonwealth argued as follows: the defendant was angry at the victim for asking him to move out. He broke into the gun safe in the basement using the shovel, injuring himself in the process. He then cut the gunlock off the Winchester rifle, loaded it with ammunition, and shot the victim on the first floor of the home. The victim attempted to climb the stairs and collapsed on the landing, where she was discovered by her husband. After shooting the victim, the defendant returned to the basement, struck the rifle against the floor to remove the spent cartridge casing (breaking the rifle's wooden stock in the process), and reloaded the rifle. The defendant went out of the basement through the open bulkhead and into the woods before aiming his rifle at the emergency personnel as described supra.
**761 The jury convicted the defendant on all charges.[11] This appeal followed.
2. Discussion. a. Sufficiency of the evidence. On appeal, the defendant argues that the Commonwealth failed to present sufficient evidence that he shot the victim. First, he argues that no evidence permitted the jury to connect the ".22 caliber class projectile" extracted from the victim's body to the .223 caliber Remington cartridge casing that was found in the basement and shown by firing pin analysis to have been fired from the Winchester rifle in his possession. Second, he argues, in effect, that the evidence was insufficient to convict him because there was greater evidence of a third-party culprit, namely, the brother. In reviewing the sufficiency of the evidence, "[w]e consider whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." Commonwealth v. Ayala, 481 Mass. 46, 51, 112 N.E.3d 239 (2018), citing Commonwealth v. Latimore, 378 Mass. at 677-678, 393 N.E.2d 370. We conclude that there was sufficient evidence to find the defendant guilty of the victim's murder beyond a reasonable doubt.
Because no one witnessed the murder, the Commonwealth's case largely relied on the testimony of the brother concerning the conduct of the defendant on July 11 and on expert analysis of circumstantial physical evidence connecting the defendant to the shooting. "A conviction may rest exclusively on circumstantial evidence, and, in evaluating that evidence, we draw all reasonable inferences in favor of the Commonwealth." Commonwealth v. Rakes, 478 Mass. 22, 32, 82 N.E.3d 403 (2017). Although we will not let a conviction stand if it is "based entirely on conjecture or speculation," Ayala, 481 Mass. at 51, 112 N.E.3d 239, "[i]nferences drawn from circumstantial evidence 'need only be *84 reasonable and possible; [they] need not be necessary or inescapable,' " Commonwealth v. Webster, 480 Mass. 161, 167, 102 N.E.3d 381 (2018), quoting Commonwealth v. Beckett, 373 Mass. 329, 341, 366 N.E.2d 1252 (1977). "To the extent that conflicting inferences may be drawn from the evidence, it is for the jury to decide which version to credit" (quotations omitted). Webster, supra, quoting **762 Commonwealth v. Barbosa, 477 Mass. 658, 666, 81 N.E.3d 293 (2017). We consider the defendant's arguments concerning the sufficiency of the evidence in turn.
i. Evidence that the defendant was the shooter. Here, there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant was the shooter. In particular, it was reasonable and possible for the jury to find that the ".22 class projectile" with which the victim was shot came from the spent .223 cartridge casing fired by the Winchester rifle in the defendant's possession. There was a .223 caliber live round found near the rifle when the defendant was apprehended, and three more in his pockets. As discussed, the Commonwealth's ballistics expert testified that (1) the cartridge was seriously deformed and the projectile lacked the expected rifling; (2) these features provided sufficient evidence that both the cartridge and the projectile had been fired from a gun larger than the kind for which they were designed; and (3) the Winchester rifle could have been the larger gun in question with respect to both the cartridge and the projectile. The expert further testified that, based on firing pin analysis, he concluded with a "reasonable degree of ballistics certainty" that the Winchester rifle fired the .223 caliber cartridge.[12] The jury also reasonably could have inferred that the cartridge that was fired by the Winchester rifle corresponded to the bullet found in the victim's body that was compatible with the Winchester rifle. This reasonable inference of compatibility was sufficient for the jury to identify the defendant as the shooter, at least in concert with the other evidence of the defendant's motive and opportunity discussed infra. See Commonwealth v. Morgan, 449 Mass. 343, 345, 351, 358, 868 N.E.2d 99 (2007) (evidence sufficient to conclude beyond reasonable doubt that defendant shot victim when defendant seen in possession of two weapons from either of which fatal bullet "could have been fired"); Commonwealth v. Arroyo, 442 Mass. 135, 139 n.5, 810 N.E.2d 1201 (2004) (shell casings found at scene "tend to prove that the victims were shot" with gun possessed by defendant that could have fired shell casings, even when no definitive match between gun and casings); Commonwealth v. Doucette, 408 Mass. 454, 460, 461, 559 N.E.2d 1225 (1990) ("although the evidence was far from **763 overwhelming, it was sufficient to warrant a rational trier of fact to find beyond a reasonable doubt that the defendant murdered" victim when defendant was seen with "gun capable of firing the kind of bullets that were found in [victim's] head").
Furthermore, the only reasonable candidate for the gun that fired both the ".22 caliber class projectile" and the .223 caliber cartridge was the Winchester rifle found on the defendant at the scene of the crime. The jury could have inferred that *85 only a single shot was fired on the night of July 11, most likely from the rifle in the defendant's possession: they received testimony that (1) a neighbor heard a single gunshot at 11:45 P . M ., shortly before emergency services arrived at the property; (2) the .223 caliber cartridge casing was the only spent cartridge casing recovered at the scene that was not connected to the ten shots fired by the police officer; and (3) no other gun in the home seemed to have been fired that night other than the Winchester rifle that produced the .223 caliber cartridge case.[13] It was thus reasonable to infer that the projectile came from the .223 caliber cartridge casing discharged by that gun, particularly because the jury heard expert testimony about the components of ammunition that would have allowed them to determine through physical inspection that the bullet was smaller than and thus compatible with the .223 caliber cartridge.[14]
We also "must look at the evidence as a whole and not examine exhaustively each piece of evidence separately." Commonwealth v. Salim, 399 Mass. 227, 233, 503 N.E.2d 1267 (1987). Here, the jury heard testimony that the defendant immediately grew angry at the victim for asking him to leave the home. He harbored this resentment throughout the day of the victim's death. He was at the location of the crime, the home where he was staying, several hours before the victim was shot. There was considerable DNA and other **764 physical evidence that, on the night of the crime, the defendant violently broke into the gun safe in the basement, cut the trigger lock off a rifle, and took the rifle and ammunition. The defendant was presumably on the property when a shot was heard at 11:45 P . M ., but he was nowhere to be seen when the victim was discovered bleeding on the stairs at around midnight, until he emerged from the woods carrying the Winchester rifle and pointed it at the emergency personnel. As discussed supra, the rifle and ammunition found on the defendant's person when he was subdued by police shortly after the victim's shooting were compatible with the bullet that killed the victim. Finally, the defendant's comment to the police after he was shot ("Next time I'll come back with a bigger gun") suggested that the defendant had earlier been using his gun. "This evidence, when taken together, formed a mosaic of evidence such that the jury could conclude, beyond a reasonable doubt, that the defendant was the shooter" (quotation and citation omitted). Ayala, 481 Mass. at 53, 112 N.E.3d 239. See ibr.US_Case_Law.Schema.Case_Body:v1">id. (sufficient circumstantial evidence that defendant was shooter where jury could have found that defendant had gun, was angry at victim, and was in vicinity when shooting occurred). Cf. Morgan, 449 Mass. at 351, 868 N.E.2d 99 (sufficient evidence to convict defendant when his statements showed hostility to victim, he possessed potential murder *86 weapon, and he behaved suspiciously the evening victim disappeared).
ii. Evidence of a third-party culprit. The defendant argues that in light of evidence that the brother was a third-party culprit, no rational jury could have found beyond a reasonable doubt that the defendant murdered the victim. Specifically, he points to evidence indicating that (1) the brother shared the defendant's motive because the victim also asked him to move out; (2) a bloodstain containing the brother's DNA was found on the wall at the top of the stairs to the basement; (3) the brother could have removed gunshot residue from his hands when he washed them in the kitchen sink. The defendant further argues that the brother was not a credible witness due to inconsistencies between his testimony and those of other witnesses.[15] We conclude that this evidence does not affect the sufficiency of the evidence of the jury's verdict.
As discussed supra, the Commonwealth provided sufficient **765 evidence for the jury to find beyond a reasonable doubt that the defendant shot the victim. "[T]he Commonwealth does not have the burden of proving no one else may have committed the murder," but rather its "burden is to prove beyond a reasonable doubt that the defendant committed the murder" -- a burden that it satisfied. Commonwealth v. Gomes, 459 Mass. 194, 208, 944 N.E.2d 1007 (2011). See Commonwealth v. Hoose, 467 Mass. 395, 412, 5 N.E.3d 843 (2014) ("Commonwealth does not have the burden to prove beyond a reasonable doubt that some third party is not guilty of the charged crime"). The alleged inconsistencies in the brother's testimony and certain supposed "problems" with his conduct on the night of the murder were aired through cross-examination and closing argument and are matters concerning the "weight and credibility of the evidence" that are the "province of the jury." Commonwealth v. Gomez, 450 Mass. 704, 711, 881 N.E.2d 745 (2008). See Commonwealth v. Mendez, 476 Mass. 512, 524, 69 N.E.3d 968 (2017) ("The credibility of a witness is for the jury to decide"). In any case, the evidence much more strongly demonstrated the "defendant's culpability as the perpetrator such that a jury could reasonably infer that the defendant was the shooter beyond a reasonable doubt." Morgan, 449 Mass. at 350-351, 868 N.E.2d 99.
b. Challenges to the convictions of assault by means of a dangerous weapon ( G. L. c. 265, § 15B ) and armed assault with intent to murder ( G. L. c. 265, § 18 [ b ] ). The defendant argues that his convictions of assault by means of a dangerous weapon under G. L. c. 265, § 15B, and armed assault with intent to murder under G. L. c. 265, § 18 (b ), should be vacated because the Commonwealth failed to prove the operability of his rifle at the time of the offenses. The defendant also contends it was error for the judge not to give an operability instruction with respect to the charge of assault by means of a dangerous weapon.[16]
*87 The indictments alleged that the defendant "did assault [the paramedic] by means of a dangerous weapon, to wit: RIFLE" and **766 that "being armed with a dangerous weapon, to wit, A RIFLE, [the defendant] did assault [the police officer] with intent to murder him." Whether G. L. c. 265, § 15B or 18 (b ), requires a "dangerous weapon" or "rifle" to be operational is a matter of law that we review de novo. See Commonwealth v. Moffat, 478 Mass. 292, 298, 85 N.E.3d 38 (2017) (de novo review where claim involves statutory interpretation). We conclude that neither statute contains an operability requirement.[17] We nonetheless analyze the two statutes separately, as an element of armed assault with intent to murder under G. L. c. 265, § 18 (b ), is a specific intent to murder that requires proof that the defendant believed the firearm to be operational.
i. Assault by means of a dangerous weapon ( G. L. c. 265, § 15B ). In relevant part, G. L. c. 265, § 15B (b ), states:
"Whoever, by means of a dangerous weapon, commits an assault upon another shall be punished by imprisonment in the state prison for not more than five years or by a fine of not more than one thousand dollars or imprisonment in jail for not more than two and one-half years."
**767 The elements of assault by means of a dangerous weapon are that a defendant committed an assault, the defendant intended to commit an assault, and that the assault was committed by means of a dangerous weapon. See Commonwealth v. Anderson, 461 Mass. 616, 633, 963 N.E.2d 704 (2012) ; Commonwealth v. Porro, 458 Mass. 526, 530, 939 N.E.2d 1157 (2010) ; Commonwealth v. Melton, 436 Mass. 291, 295, 763 N.E.2d 1092 (2002). The Commonwealth must prove the "existence of every element of the crime charged" (citation *88 omitted). Commonwealth v. Mattei, 455 Mass. 840, 844, 920 N.E.2d 845 (2010). See Commonwealth v. Garcia, 95 Mass. App. Ct. 1, 4, 120 N.E.3d 341 (2019), quoting Commonwealth v. Hobbs, 385 Mass. 863, 869, 434 N.E.2d 633 (1982) ("crimes must be 'proved as charged' ").
We have explained that "[u]nder the common law, an assault may be perpetrated in either of two ways. The crime may consist of 'an attempted battery' or 'an immediately threatened battery.' " Commonwealth v. Melton, 436 Mass. 291, 294, 763 N.E.2d 1092 (2002), quoting Commonwealth v. Gorassi, 432 Mass. 244, 247, 733 N.E.2d 106 (2000).[18] Furthermore, with respect to either the "attempted battery" or "immediately threatened battery" form of assault, the defendant need only have the "apparent ability" to do bodily harm or carry out his or her threat. See Commonwealth v. Henson, 357 Mass. 686, 692, 259 N.E.2d 769 (1970) ("Where an assault may be committed either by an attempt to commit a battery or by an unlawful act placing the other in reasonable apprehension of receiving an immediate battery, it is clear that apparent ability will suffice [quotation and citation omitted]").[19] The " 'relevant conduct ... is an outward **768 demonstration of force,' and requires 'only apparent ability to injure.' " Mattei, 455 Mass. at 845, 920 N.E.2d 845, quoting Commonwealth v. Appleby, 380 Mass. 296, 305, 402 N.E.2d 1051 (1980).
The "required element" of G. L. c. 265, § 15B, that raises questions here is whether the defendant made "use of a dangerous weapon to commit the assault." Commonwealth v. Muller, 461 Mass. 1009, 1010, 963 N.E.2d 726 (2012). "[I]n assault by means of a dangerous weapon, whether the weapon is actually used to inflict harm is largely irrelevant. Rather, as we have stated, the "relevant point is the 'objectively menacing conduct of the defendant ... [producing] the fear of harm which it was intended to produce, with the same consequential tendency to provoke a breach of the peace.' " Commonwealth v. Tarrant, 367 Mass. 411, 415, 326 N.E.2d 710 (1975), quoting *89 Commonwealth v. Slaney, 345 Mass. 135, 140, 185 N.E.2d 919 (1962). See Henson, 357 Mass. at 692, 259 N.E.2d 769. See also J.R. Nolan & L.J. Sartorio, Criminal Law § 324 (3d ed. 2001) ("The question is whether the object has the apparent ability to inflict harm if used as threatened, the secret intent of the defendant being immaterial").
In Henson, 357 Mass. at 687-688, 693, 259 N.E.2d 769, we held that a gun that only had the apparent ability to injure because it could only fire "blank" cartridges or "BB shot" was sufficient for a conviction of assault by means of a dangerous weapon under G. L. c. 265, § 15B. There, we explained:
"The fundamental reason for permitting a conviction for simple assault on proof of apparent ability of the assailant to accomplish the attempted or threatened battery is that the public peace and order is affected by and dependent upon what is reasonably apparent, and not upon secret fact or reason rendering the assailant incapable of accomplishing the battery. The reason applies with even greater force to a case of apparent ability to accomplish a battery attempted or threatened by means of a firearm. The threat to the public peace and order is greater, and natural reactions thereto by the intended victim and others may be more sudden and violent than in cases where no weapon is involved."
**769 Id. at 693, 259 N.E.2d 769. Applying the "apparent ability" test, we thus held that the "mere fact that a firearm brandished by an assailant is known by him to be unloaded, or to be loaded with blank cartridges, does not entitle him to an acquittal on a charge of the aggravated offence of assault by means of a dangerous weapon." Id. at 693-694, 259 N.E.2d 769.
Under Henson, it is clear that a weapon need not actually be capable of inflicting death or serious harm to be a "dangerous weapon" so long as it has the apparent ability to do so. Consequently, there is no merit to the defendant's argument that he was entitled to an operability instruction with respect to the charge of assault by means of a dangerous weapon: such an instruction would conflict with the apparent ability rule explicated in Henson because a weapon may have the apparent ability to harm regardless of whether it is operable.[20] We do recognize, however, the **770 *90 potential for jury confusion arising out of the "dangerous weapon" aspect of the instruction regarding assault by means of a dangerous weapon in cases where the firearm may not be working or is otherwise not dangerous because, for example, it is loaded with blanks. In such cases, a jury cannot simply be instructed that a firearm is dangerous per se, as was done by the judge here. Rather, a jury should be instructed using the following language drawn from Commonwealth v. Powell, 433 Mass. 399, 401, 742 N.E.2d 1061 (2001) :
"Dangerous weapons include those displayed in a way such that they reasonably appear capable of causing serious injury or death. An object that is, on closer inspection, incapable of inflicting serious injury or death can still be a dangerous weapon if, at the time of the offense, it would have been reasonable to believe that it was capable of inflicting such injury."[21]
In the instant case, there was sufficient evidence for the jury to find that the defendant committed assault by means of a dangerous weapon because he had the apparent ability to seriously injure or kill the paramedic.[22] The paramedic, who was familiar with lever action rifles, saw the defendant pull the lever action of the rifle down and back, raise the gun to firing position, and point it in his direction. The paramedic shouted "he's got a gun," coupled with an obscenity, and immediately ran away. He fled inside the home and took cover "in a secure place." The paramedic's actions reveal that the rifle had the apparent ability to cause death or serious injury and thus that the rifle fulfilled the dangerous weapon element of G. L. c. 265, § 15B.
ii. Armed assault with intent to murder ( G. L. c. 265, § 18 [ b ] ). In relevant part, G. L. c. 265, § 18 (b ), states:
"Whoever, being armed with a dangerous weapon, assaults another with intent to ... murder shall be punished by **771 imprisonment in the state prison for not more than twenty years. Whoever, being armed with a firearm, shotgun, rifle, machine gun or assault weapon assaults another with intent to ... murder shall be punished by imprisonment in state prison for not less than five years and not more than [twenty] years" (emphasis added).
"The elements of armed assault with intent to murder are 'that the defendant committed an assault, that he was armed with a dangerous weapon, and that he had the *91 specific intent of murdering the victim in assaulting him.' " Commonwealth v. Bolling, 462 Mass. 440, 453, 969 N.E.2d 640 (2012), quoting Commonwealth v. Lopez, 383 Mass. 497, 500, 420 N.E.2d 319 (1981). We discern no reason to treat the armed assault aspect of G. L. c. 265, § 18 (b ), any differently from assault by means of a dangerous weapon under G. L. c. 265, § 15B. The rationale articulated in Henson, 357 Mass. at 693, 259 N.E.2d 769, concerning the objectively menacing aspect of an assault with a firearm and the heightened threat to "public peace and order" applies equally to both forms of armed assault.[23]
This offense contains an additional element, however: the intent to murder. Thus, it is a specific intent crime. Bolling, 462 Mass. at 453, 969 N.E.2d 640. If a defendant lacks the specific intent to kill because he or she believes his or her gun is not operable, the defendant cannot be convicted of armed assault with intent to murder. See Commonwealth v. Gordon, 41 Mass. App. Ct. 459, 462, 671 N.E.2d 972 (1996) ("critical question" for conviction of armed assault with intent to murder is whether defendant knew pistol was jammed and hence inoperable when he pointed it at police officers). For these purposes, the issue is not whether the gun is operable, but whether the defendant thinks it is.
We conclude that there was sufficient evidence for a jury to find all the elements of armed assault with intent to murder. There was overwhelming evidence that the defendant had the apparent ability to seriously injure or kill the police officer and sufficient evidence that he had the specific intent to do so. The officer saw the defendant point the raised rifle at him and "track" him with the rifle. He even believed that the defendant might be shooting **772 him and thought "I'm dead." This conduct revealed "an outward demonstration of force" and an "apparent ability to injure" (citation omitted). Mattei, 455 Mass. at 845, 920 N.E.2d 845. The defendant's rifle thus remained a "dangerous weapon" for purposes of both G. L. c. 265, §§ 15B and 18 (b ).
Although a closer question, there was sufficient evidence for the jury to infer that the defendant assaulted the police officer with a rifle with the intent to murder him, i.e., by shooting him with the rifle, particularly because it was not clear whether the rifle had become inoperable before or after the defendant pointed it at the first responders, as discussed infra. The rifle had earlier been used to kill the victim. There was evidence to support the Commonwealth's argument that the rifle had been reloaded at the time of the assault, namely the presence of a live .223 caliber round found near the open rifle. The jury thus could infer that, despite the fact that the defendant's rifle was later shown to be incapable of firing, the defendant believed it was operational at the time of the assault. This inference is supported by the defendant's conduct, for example his pulling the lever action of the rifle down and back (indicating that he was reloading the rifle), and by the presence of several rounds of live ammunition, of the sort that he had previously used to shoot the victim, in the defendant's pockets. Additionally, the defendant held onto the rifle even after he had been shot and the police had to take it away from him. Cf. Commonwealth v. Lewis, 465 Mass. 119, 126, 987 N.E.2d 1218 (2013) (defendant's "persistence in pointing a loaded gun at the *92 man who had just wounded him with lethal force [was] circumstantial evidence from which the jury could infer that, at that juncture, the defendant had formed a specific intent to kill" police officer). In short, there was sufficient evidence for the jury to infer the defendant's specific intent to murder the police officer. See id. (sufficient evidence for jury to convict defendant of armed assault with intent to murder despite his never having fired his gun).
We thus hold that the defendant was properly convicted of both assault by means of a dangerous weapon under G. L. c. 265, § 15B, and armed assault with intent to murder under G. L. c. 265, § 18 (b ).
iii. Jury instructions. The judge's instruction on armed assault with intent to murder under G. L. c. 265, § 18 (b ), was incorrect on the issue of operability, but the error did not rise to the level **773 of a substantial risk of a miscarriage of justice.[24] With respect to that charge, the judge erroneously instructed the jury that they had to find that the defendant's weapon was operational and met the "definition" of a "rifle," specifically that it was in fact "capable of discharging a shot or bullet" or at least doing so with only a "slight repair, replacement or adjustment." Because the defendant did not object, we review for a substantial risk of a miscarriage of justice. We conclude that there was none. As explained, the instruction was patently incorrect and did not become the law of the case. See note 17, supra. The defendant also benefited from the instruction, as the judge needlessly required the firearm to be operational in order to obtain a guilty verdict on the charge of armed assault with intent to murder. Finally, based on the evidence in the light most favorable to the Commonwealth, the jury could have found that the rifle was operational at the time the defendant aimed it at the police officer and only became inoperable when another police officer kicked and threw it after taking it from the defendant.
With respect to the charge of assault by means of a dangerous weapon under G. L. c. 265, § 15B, the judge did not give an operability instruction. Rather, he stated that the "final element the Commonwealth must prove is that the assault was committed with a dangerous weapon. A dangerous weapon is an item which is *93 capable of causing serious injury or death. I instruct you, as a **774 matter of law, that a rifle is a dangerous weapon." For the reasons discussed supra, this instruction was confusing when the operability of the rifle was in question. The judge instead should have given an instruction drawn from our decision in Powell, 433 Mass. at 401, 742 N.E.2d 1061, set forth supra.
There was, however, no objection, and we discern no substantial risk of a miscarriage of justice arising from this instruction. The evidence that the weapon was brandished and aimed in a way that reasonably made it appear capable of causing serious injury or death was overwhelming. The jury also found the defendant guilty of armed assault with intent to murder where the judge had imposed the additional requirement that the weapon be operational. The jury thus found that the weapon not only appeared capable of causing serious injury or death but actually was capable of causing injury or death. In these circumstances, there was no substantial risk of a miscarriage of justice due to the erroneous instruction.
c. Review under G. L. c. 278, § 33E. After a thorough review of the record, we find no reason to exercise our authority under G. L. c. 278, § 33E, to grant a new trial or to reduce or set aside the verdict of murder in the first degree.
Judgments affirmed.

The note was admitted in evidence, over the defendant's objection that it was hearsay, to show the effect of the note on the defendant. It stated: "[Brother], Luv u! Go to nascar do what u want to do But find a place for u and [defendant] Killing my relationship with [husband]. Too easy to live here! Looking for a Caretaker not to be one!"

The brother did not hear a gunshot, but he testified that he had lifelong hearing issues, in addition to closing the bedroom door and sleeping with a fan. The husband could not testify because he died before trial.

The emergency personnel believed they were responding to an accident involving someone who had fallen on the stairs. It was nonetheless the practice for Middleborough police to respond to medical 911 calls along with other emergency personnel.

A lever action rifle is loaded by pulling the lever down to load a cartridge into the chamber and then fired by bringing the lever back up and pulling the trigger. After the rifle is fired, the empty cartridge case remains inside until it is ejected by pulling the lever down.

The police officer's service weapon was a Sig Sauer semiautomatic handgun equipped with .40 caliber Smith and Wesson ammunition. Ten cartridge casings were recovered corresponding to this type of ammunition.

The ballistics expert explained that, even after reattaching the missing stock, the .32-.40 caliber Winchester rifle was not firing because the lever was not properly hitting the "trigger stop." To make the rifle fire again, the ballistician had to use a vice, hammer, and screwdriver to (1) loosen one of the rear screws on top of the "tangs" or metal protrusions that attach the rifle stock; (2) straighten out one of the tangs; and (3) put one of the "links" back into place.

Rifling refers to the marks imparted on a bullet as a gun is fired by grooves placed in the barrel of a rifle or handgun in order to give stability to the bullet in flight. Ballistics experts use rifling as a "class characteristic" to determine whether a particular bullet is consistent with being fired from a particular gun.

According to the expert, firing pin analysis is based on recognizing a pattern of "microscopic marks that are unique to each weapon" left by the firing pin of a gun on a section of the cartridge known as the primer. A discharged cartridge casing retains the primer with these unique marks. The firing pin marks on a test-fired cartridge are then compared to determine whether the cartridges were fired from the same gun.

The expert test-fired the Winchester rifle three times, once using a ".38 special caliber primed cartridge" with no gunpowder to see if the rifle had been correctly repaired, and twice using .32-.40 caliber ammunition. He did not test-fire the rifle using .223 caliber ammunition because he thought it would be dangerous to do so.

The primer of the casing was bulging out of the base, there was a large tear in the wall of the casing, and the "shoulders" of the casing -- the area of the casing that narrows to the "neck," where the projectile is held -- had been "blown out". The expert concluded that these features were "not consistent with [the cartridge] having been fired from a weapon chambered with .223 Remington ammunition." He testified, however, that the size of the .223 caliber cartridge was consistent with having expanded to fit the size of the chamber of the Winchester rifle.

The defendant had initially been charged with three counts of larceny of a firearm, but the Commonwealth dismissed two of them. Additionally, before instructing the jury, the judge granted the defendant's motion for a required finding of not guilty with respect to a charge of threatening to commit a crime under G. L. c. 275, § 2.

In Commonwealth v. Pytou Heang, 458 Mass. 827, 837-838, 845, 942 N.E.2d 927 (2011), we concluded that forensic ballistics testimony based on the theory "that all firearms possess distinctive features that in turn impart distinctive markings or 'toolmarks' onto projectiles and cartridge casings when the weapon is fired" was sufficiently reliable to be admissible in a murder trial. See id. at 839, n.19, 942 N.E.2d 927 (firing pin analysis).

When police searched the property at 7 a . m . on the morning of July 12, the only rifles not in their expected places were the Winchester rifle in the defendant's possession and two .22 caliber rifles that had been removed from the gun safe. Indeed, the one other rifle that, according to the ballistics expert, could definitely fire .223 caliber ammunition was a commemorative John Wayne rifle found in a closet and covered in dust. Furthermore, the jury heard testimony that the .22 caliber rifles could not fire .223 caliber ammunition.

The jury received a visual explanation from the ballistics expert of the different components of a generic piece of ammunition. They were told that the bullet or projectile was a component within the cartridge casing, i.e., that a cartridge is bigger than the bullet that it contains. Here, the bullet appears to be approximately one-half the diameter of the cartridge casing.

In particular, the brother testified that he was not drunk when he fell asleep at 10 p . m ., but a police officer testified that he appeared intoxicated shortly after midnight. Furthermore, the brother testified that both police officers never entered the house, but the officers testified that they had in fact gone inside.

The defendant raised the defense of inoperability only with respect to the charges of unlawful possession of a firearm or ammunition without a firearm identification card under G. L. c. 140, § 129C. He also did not object to any of the jury instructions as given by the judge, although he did object to the Commonwealth's request to include the example of a broken firing pin in the operability instruction; the judge did not include the Commonwealth's requested instruction regarding the firing pin. We therefore review the defendant's claim that he was entitled to an operability instruction for a substantial risk of a miscarriage of justice. Commonwealth v. The Ngoc Tran, 471 Mass. 179, 183-184, 27 N.E.3d 1261 (2015).

We further reject the defendant's argument that the operability instruction given with respect to armed assault with intent to murder became the "law of the case" and thus an element that the Commonwealth was required to prove. A jury instruction that "add[s] elements to the government's burden of proof beyond those required by statute ... may not become the law of the case" if it is "patently incorrect." United States v. Zanghi, 189 F.3d 71, 79 (1st. Cir. 1999), cert. denied, 528 U.S. 1097, 120 S.Ct. 839, 145 L.Ed.2d 705 (2000). See Hohenleitner v. Quorum Health Resources, Inc., 435 Mass. 424, 433, 758 N.E.2d 616 (2001), citing Zanghi, supra ("patently incorrect" jury instruction does not become "law of the case"). See also Musacchio v. United States, --- U.S. ----, 136 S. Ct. 709, 715, 193 L.Ed.2d 639 (2016) ("when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction"); Commonwealth v. White, 475 Mass. 724, 731 n.12, 61 N.E.3d 423 (2016), citing Commonwealth v. David, 365 Mass. 47, 55-56, 309 N.E.2d 484 (1974) ("We do not accept the defendant's claim that, because the trial judge erroneously instructed the jury that they needed to find 777 days of tolling, rather than four months, this higher number controls for purposes of our sufficiency review"); Commonwealth v. Bruneau, 7 Mass. App. Ct. 858, 858, 386 N.E.2d 29 (1979), citing David, supra ("The judge's erroneous instruction to the effect that the defendant's bomb would not fall within the prohibition of G. L. c. 148, § 35, if it were not of a 'high explosive' variety was unduly favorable to the defendant, who could not have been prejudiced by the error. There is nothing to the contention that the erroneous ruling became the law of the case, requiring that the evidence conform to the requirements of the instruction rather than those of the statute").

The judge erred when he stated that, under the immediately threatened battery theory of assault, the "Commonwealth must demonstrate that as a result of the threatened conduct, the victim did, in fact, experience a reasonable fear of immediate physical harm." To convict under the immediately threatened battery theory, the "victim need not actually be in fear but must apprehend the risk of an imminent battery." Commonwealth v. Porro, 458 Mass. 526, 531, 939 N.E.2d 1157 (2010). See Commonwealth v. Musgrave, 38 Mass. App. Ct. 519, 523, 649 N.E.2d 784 (1995), S.C., 421 Mass. 610, 659 N.E.2d 284 (1996) ("proof of an intent to cause fear or apprehension" of immediate battery was required for conviction of assault by means of dangerous weapon [emphasis added] ); Commonwealth v. Gordon, 407 Mass. 340, 349, 553 N.E.2d 915 (1990), quoting Commonwealth v. Delgado, 367 Mass. 432, 437, 326 N.E.2d 716 (1975) ("Under the common law, 'it is well established ... that an act placing another in reasonable apprehension that force may be used is sufficient for the offense of criminal assault' " [emphasis added] ). As this error benefited the defendant, however, we conclude that it was harmless.

Consistent with Commonwealth v. Henson, 357 Mass. 686, 692, 259 N.E.2d 769 (1970), the judge instructed the jury with respect to the "attempted battery" form of assault that "the Commonwealth must ... prove that the defendant had the actual or apparent ability to inflict bodily harm. This means that the Commonwealth need not show the defendant possessed the actual ability to do bodily harm. Apparent ability will suffice." With respect to the "immediately threatened battery" form of assault, he likewise correctly instructed that, "similar to the first type of assault, the Commonwealth need not demonstrate that the defendant had the actual ability at the time of the alleged assault to carry out the threat. Apparent ability will suffice."

The defendant bases his argument on Commonwealth v. Bartholomew, 326 Mass. 218, 219, 93 N.E.2d 551 (1950), where we considered whether a conviction for unlawful possession of a firearm under G. L. c. 269, § 10 (Ter. Ed.), should be vacated on the ground that the defendant's "gun was not a machine gun within the meaning of [G. L. c. 140, § 121 (Ter. Ed.),]" because it was not able to fire in the absence of a firing pin. There, we explained that a "weapon designed for firing projectiles" cannot be deemed a "rifle" as a matter of law if it requires more than a "relatively slight repair, replacement, or adjustment" to "make it an effective weapon." Id. at 220, 93 N.E.2d 551. General Laws c. 269, § 10 (a ), however, incorporates the definitions of firearms, rifles, and other weapons contained in G. L. c. 140, § 121. The latter statute defines a "firearm" as a "pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged" and a "rifle" as a "weapon having a rifled bore with a barrel length equal to or greater than [sixteen] inches and capable of discharging a shot or bullet for each pull of the trigger" (emphases added). Thus, G. L. c. 269, § 10, contains an operability requirement, whereas the language of G. L. c. 265, §§ 15B and 18 (b ), does not. Furthermore, G. L. c. §§ 15B and 18 (b ), are statutes that cover assault, while G. L. c. 269, § 10, does not. Cf. Cepulonis v. Commonwealth, 384 Mass. 495, 501 n.5, 427 N.E.2d 17 (1981) ("The Commonwealth need not have introduced the description of a machine gun contained in G. L. c. 140, § 121 [an element of proof needed to obtain a conviction for unlawful possession of a machine gun] to support the offense under G. L. c. 265, [§] 15A").
An instruction based on Bartholomew is appropriate in the context of unlawful possession of a firearm under G. L. c. 269, § 10 (h ) (1), as was in fact given in this case. See, e.g., Commonwealth v. Jefferson, 461 Mass. 821, 828, 965 N.E.2d 800 (2012) (sufficient evidence for jury to find that, for purposes of charges of unlawful possession of a firearm, revolver requiring "slight repair with pair of pliers" was "firearm" within meaning of G. L. c. 140, § 121 ). See also Commonwealth v. Rhodes, 21 Mass. App. Ct. 968, 969, 489 N.E.2d 216 (1986) ("An essential element of the offense against G. L. c. 269, § 10 [a ], is that the firearm carried be a working one;" pistol requiring replacement of "sear bar" to fire again not firearm within meaning of G. L. c. 140, § 121 ).

Although Commonwealth v. Powell, 433 Mass. 399, 401, 742 N.E.2d 1061 (2001), involved a conviction of armed robbery under G. L. c. 265, § 17, we conclude the "standard definition" of dangerous weapon announced there is applicable to the "dangerous weapon" element of G. L. c. 265, § 15B.

"Because attempted battery and threatened battery are closely related, ... we do not require that a jury be unanimous as to which theory of assault forms the basis for their verdict." Commonwealth v. Boodoosingh, 85 Mass. App. Ct. 902, 903, 4 N.E.3d 1293 (2014), quoting Porro, 458 Mass. at 534, 939 N.E.2d 1157.

An instruction based on the definition of "dangerous weapon" (if there is a question regarding the operability or dangerousness of the firearm) set forth in the Powell case is appropriate with respect to both assault by means of a dangerous weapon and armed assault with intent to murder. See Powell, 433 Mass. at 401, 742 N.E.2d 1061.

We review convictions of crimes other than murder (except for the predicate felony in a felony-murder conviction) for a substantial risk of a miscarriage of justice. See Commonwealth v. Bolling, 462 Mass. 440, 452, 969 N.E.2d 640 (2012) ("Because the defendant did not object to the judge's omission of the [jury] instruction, and because the instruction relates to a crime other than murder in the first degree [i.e., armed assault with intent to murder], we review for a substantial risk of a miscarriage of justice"); Commonwealth v. Durand, 457 Mass. 574, 592 n.24, 931 N.E.2d 950 (2010), S.C., 475 Mass. 657, 59 N.E.3d 1152 (2016), cert. denied, --- U.S. ----, 138 S. Ct. 259, 199 L.Ed.2d 167 (2017) ("we are reviewing the introduction of the involuntary statement only in relation to the conviction of assault and battery by means of a dangerous weapon. Accordingly, the defendant is not entitled to the more deferential standard that applies pursuant to G. L. c. 278, § 33E," but rather court reviews for substantial risk of miscarriage of justice); Commonwealth v. Shine, 398 Mass. 641, 655, 500 N.E.2d 1299 (1986) (for "conviction of a crime other than one of murder in the first degree ... test is whether there is a substantial risk of a miscarriage of justice"). See also Commonwealth v. Jewett, 442 Mass. 356, 368-369, 813 N.E.2d 452 (2004) (where defendant convicted of both murder in first degree and rape, applying "substantial risk of a miscarriage of justice" standard to rape conviction); Commonwealth v. Ferreira, 417 Mass. 592, 597, 632 N.E.2d 392 (1994) (where defendant convicted of both murder in first degree and kidnapping and unarmed robbery, applying "substantial risk of a miscarriage of justice" standard to nonmurder convictions).